Filed 5/25/22  P. v. Vargas-Alvarez CA6
(see concurring & dissenting opinion)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE VARGAS-ALVAREZ et al.,<br><br>Defendants and Appellants. | H045450<br>(Santa Clara County<br>Super. Ct. No. 211412) |

In 2006, the federal Drug Enforcement Agency (DEA) began investigating a drug trafficking operation (DTO) headed by defendant Jose Vargas-Alvarez.  Codefendants Emanuel Vargas-Alvarez and Guillermo Velasquez were part of the DTO, which transported and sold large quantities of cocaine and methamphetamine throughout the San Francisco Bay Area as well as Southern California.

Following a joint trial, a jury convicted the defendants of multiple drug-related offenses, as well as offenses related to the kidnapping of an individual Jose[1] suspected of being involved in the theft of $2 million from one of the DTO's "stash" houses.  The trial court sentenced Jose to a total prison term of 47 years eight months.  Emanuel and Guillermo were sentenced to prison terms totaling 30 years eight months.

---

[1] Because Emanuel and Jose share a surname, we will refer to each of the defendants individually by their first names and as "defendants" collectively to avoid confusion.

On appeal, the defendants raise the following arguments: (1) the trial court erred in the procedure by which it evaluated their motion to compel discovery relating to the wiretap authorizations;[2] (2) the trial court erroneously denied Jose's motion to suppress evidence (a) obtained through the use of GPS tracking devices attached to a recreational vehicle (RV) or (b) seized following a traffic stop of that RV in Nebraska; (3) the trial court erred in giving the jury wiretap recordings and transcripts that were not played or read in open court; (4) defense counsel was ineffective for not objecting to the jury having access to those wiretap recordings and transcripts; (5) the jury was improperly instructed on (a) the issue of identifying defendants' voices on the wiretap recordings, (b) aider and abettor liability, and (c) as to Guillermo and Emanuel, the weight enhancement attached to the charge of possession of cocaine for sale; (6) the trial court erred in responding to the jury's questions regarding the meaning of the term "possession"; and (7) the cumulation of errors warrants reversal of the judgments. Defendants also raise sentencing errors relating to the imposition of certain fees and associated penalty assessments.

As detailed below, we reject defendants' substantive claims in their entirety, but agree that the trial court erred in calculating the fees at issue. In addition, we obtained supplemental briefing from the parties regarding recent changes in the law regarding fees which have been repealed by the Legislature, specifically Penal Code section 1203.1b[3] and former Government Code section 29550 et seq. After briefing in this case was completed and the matter submitted, Emanuel and Guillermo separately requested that we vacate submission and grant leave to file supplemental briefs regarding the impact of recent legislative enactments on their sentences, specifically the enactment of Senate Bill

---

[2] Along with this argument, defendants have asked that this court independently review the associated sealed and confidential materials.

[3] Unspecified statutory references are to the Penal Code.

2

No. 567, effective January 1, 2022. We granted the requests to file supplemental briefs, sought a response from the Attorney General, and vacated submission to consider the matters raised in the supplemental briefs.

As discussed below, we will modify Jose's judgment of conviction to correct the errors and vacate the unpaid portions of the now-repealed fees. As modified, we will affirm that judgment. We will reverse Emanuel's and Guillermo's judgments of conviction and remand for resentencing pursuant to section 1170, as amended by Senate Bill No. 567.

We previously ordered Emanuel's habeas corpus petition considered with this appeal; we deny that petition by separate order filed this day.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedure

#### 1. Second amended indictment

On June 21, 2017, Jose, Emanuel, and Guillermo were charged in a second amended indictment with conspiracy to traffic cocaine (§ 182, subd. (a); Health & Saf. Code, § 11352; count 1); kidnapping for extortion (§ 209, subd. (a); count 2); kidnapping between counties (§ 207, subd. (a); count 3); possessing cocaine for sale (Health & Saf. Code, § 11351; count 10); possessing methamphetamine for sale (Health & Saf. Code, § 11378; count 11); possessing a silencer (§ 12520; count 12); possessing more than $100,000 for the purchase of drugs (Health & Saf. Code, § 11370.6; count 14); three counts of possessing false compartments for the purpose of smuggling drugs (Health & Saf. Code, § 11366.8, subd. (a); counts 15, 16 & 17); and possessing an assault weapon (§ 12280, subd. (b); count 28). The indictment also charged Jose with a second count of conspiracy to traffic cocaine (§ 182, subd. (a); Health & Saf. Code, § 11352; count 8), two counts of conspiracy to commit murder (§§ 182, subd. (a)(1), 187; counts 4, 5), and

3

witness tampering (§ 136.1, subd. (c)(1); count 29).[4] With respect to the drug charges, the indictment further alleged weight and firearm enhancements (Health & Saf. Code, § 11370.4, subd. (a); §§ 1203.073, subd. (b)(2), 12022, subds. (c), (d)).

### 2. *Verdict*

The jury found Jose guilty of the following charges: conspiracy to traffic cocaine (counts 1, 8), kidnapping between counties (count 3), possession of cocaine for sale (count 10), possession of methamphetamine for sale (count 11), possession of a silencer (count 12), possession of more than $100,000 for the purchase of drugs (count 14), possession of a false compartment (counts 15, 16, 17), and possession of an assault weapon (count 28). The jury also found true the weight allegations attached to counts 1, 8, 10, and 11 as well as the firearm allegations attached to counts 1, 10, and 11. The jury acquitted Jose of kidnapping for extortion (count 2) and could not reach a verdict on both counts of conspiracy to commit murder (counts 4, 5).

The jury convicted Emanuel and Guillermo of conspiracy to traffic cocaine (count 1), possession of cocaine for sale (count 10), possession of methamphetamine for sale (count 11), possession of more than $100,000 for the purchase of drugs (count 14), and possession of a false compartment (counts 15, 16, 17). The jury found true the weight allegations attached to counts 1, 10, and 11, found not true the substantial involvement allegation associated with count 1, but did not reach a verdict on the firearm allegations attached to those counts. The jury found Emanuel and Guillermo not guilty of kidnapping (counts 2, 3), but found them guilty of the lesser-included offense of misdemeanor false imprisonment (§ 236) on count 3. The jury could not reach a verdict on the charges of possession of a silencer (count 12) and possession of an assault weapon (count 28).

---

[4] Before the case was submitted to the jury, the trial court dismissed the witness tampering charge (count 29) pursuant to defense counsel's section 1118.1 motion.

4

### 3. Sentencing

The trial court sentenced Jose to an aggregate term of 48 years eight months, consisting of: (1) 35 years on count 1 (the upper term of five years, plus five years for the firearm enhancement (§ 12022, subd. (c)), plus 25 years for the weight enhancement (Health & Saf. Code, § 11370.4, subd. (a)(6)); (2) a consecutive term of one year eight months on count 3 (one-third the middle term); (3) a consecutive term of nine years eight months on count 8 (one year four months (one-third the middle term), plus eight years four months (one-third of 25 years)) for the weight enhancement (Health & Saf. Code, § 11370.4, subd. (a)(6)); (4) 34 years on count 10 (the upper term of four years plus 25 years for the weight enhancement) plus five years for the firearm enhancement (§ 12022, subd. (c)), stayed pursuant to section 654; (5) a concurrent upper term of three years on count 11, with the firearm enhancement stricken pursuant to section 1385, subdivision (c)(1); (6) a consecutive term of eight months on count 12 (one-third the middle term); (7) a consecutive term of one year on count 14 (one-third the middle term); (8) a consecutive term of eight months on count 15 (one-third the middle term); (9) a concurrent upper term of three years on count 16; (10) a concurrent upper term of three years on count 17; and (11) the upper term of three years on count 28, stayed pursuant to section 654. The trial court awarded credits of 3,674 days, consisting of 3,195 custody credits plus 479 credits pursuant to section 2933.1.

The trial court imposed the following fines, fees, and assessments on Jose: (1) a $10,000 restitution fund fine (§ 1202.4); (2) a $10,000 parole revocation fund fine (§ 1202.45), suspended; (3) a $200 criminal laboratory administration fee plus a $560 penalty assessment (Health & Saf. Code, § 11372.5); (4) a $600 drug program fee plus a $1,680 penalty assessment (Health & Saf. Code, § 11372.7); (5) a $330 court security fee (§ 1465.8); (6) a $330 criminal conviction assessment (Gov. Code, § 70373); and (7) a $259.50 criminal justice administration fee payable to the County of Santa Clara (former Gov. Code, §§ 29550, 29550.1, 29550.2).

5

As to Emanuel and Guillermo, the trial court sentenced them to identical aggregate county jail terms of 30 years eight months, with three years suspended and deemed a period of mandatory supervision under section 1170, subdivision (h)(5)(B). The terms consisted of: (1) 29 years on count 10 (the upper term of four years plus 25 years for the weight enhancement (Health & Saf. Code, § 11370.4, subd. (a)(6))); (2) a consecutive one year term on count 14 (one-third the middle term); (3) a consecutive eight month term on count 15 (one-third the middle term); (4) a concurrent middle term of two years on count 11; (5) a concurrent middle term of two years on count 16; (6) a concurrent middle term of two years on count 17; and (7) a middle term of four years on count 1, stayed pursuant to section 654. The trial court awarded Emanuel and Guillermo credits of 6,389 days, consisting of 3,195 custody credits plus 3,194 credits pursuant to section 4019. On count 3, the court sentenced Emanuel and Guillermo to six months in county jail, deemed served.

The trial court imposed identical fines, fees, and assessments on Emanuel and Guillermo, as follows: (1) a $10,000 restitution fund fine (§ 12022.4); (2) a $10,000 parole revocation fund fine (§ 1202.45), suspended; (3) a $350 criminal laboratory administration fee plus a $980 penalty assessment (Health & Saf. Code, § 11372.5); (4) a $1,050 drug program fee plus a $2,940 penalty assessment (Health & Saf. Code, § 11372.7); (5) a $210 court security fee (§ 1465.8); (6) a $210 criminal conviction assessment (Gov. Code, § 70373); (7) a $259.50 criminal justice administration fee payable to the County of Santa Clara (former Gov. Code, §§ 29550, 29550.1, 29550.2); (8) a $450 presentence investigation fee (§ 1203.1b); and (9) a mandatory supervision fee of $110 per month (§ 1203.1b). On count 3, the trial court imposed a $30 court security fee (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373).

*B. Trial*

DEA Agent Anthony Herrera became involved in the investigation of the DTO in December 2008. In the course of that investigation, the DEA identified an apartment, two houses,[5] and eight vehicles, including an RV, which were used in the DTO.

*1. Wiretap evidence*

Herrera testified that, in the course of the investigation, the DEA obtained wiretaps on eight different phones used by the DTO. The wiretaps in this case were monitored by contractors with a Spanish-language interpreting company, certified to listen to wiretaps. Calls were monitored and recorded from 8:00 a.m. until midnight. Once a call began, the monitor would sign in and listen to determine if the conversation involved criminal activity. If not, the monitor would "minimize" the call, which would turn off the audio and the recording, and the conversation would be marked as "nonpertinent" in the call log. If the call was relevant to the investigation, the monitor would type a synopsis of the conversation into the narrative section of the "line sheet," which also automatically recorded the date, time, the phone numbers involved, and whether it was an outgoing or incoming call.

Blanca Dalida testified that she was one of the contractors monitoring the wiretaps on the DTO and she began listening to those calls in December 2008. Prior to listening to the calls, the monitors were briefed about the case and were required to read an affidavit describing the nature of the investigation and the individuals involved so the monitors could determine if calls were pertinent or nonpertinent. Monitors were also required to minimize calls that were subject to a privilege, such as conversations between an attorney

---

[5] One of the houses, located on Rosemere in Fremont, was a "stash house" used to store the DTO's money and drugs. The second house was in Gilroy and was a large rural property without many homes nearby.

and a client or a husband and wife. Any call that was minimized, either as nonpertinent or privileged, was not recorded.

Dalida's first language is Spanish, and the majority of calls she monitored were in Spanish. Identifying the voices "was the most important part" of Dalida's job, though she also summarized the pertinent calls for the investigating agents. To identify a voice, Dalida would use the phone number involved, context, vocal characteristics, and self-identification.

When she identified a voice, Dalida would note the name in the line sheet for that call. Dalida was provided defendants' voice exemplars—in English—following their arrest, so she could compare those with the voices she heard on the calls. Dalida prepared transcripts of the recorded calls for trial, relying in part on defendants' voice exemplars to identify participants, though the English exemplars were not "very helpful" since the calls were in Spanish. However, while preparing the transcripts, Dalida had access to the audio files and line sheets from the wiretaps. Dalida authenticated 87 transcripts of calls she monitored between December 2008 and March 2009 and those transcripts, as well as the audio of the corresponding calls, were introduced into evidence.[6]

Dalida testified that Jose's voice was distinctive as he would stutter and spoke "a little bit fast." While monitoring calls, Dalida heard Jose's voice multiple times daily. However, callers would commonly use monikers instead of names, so Dalida would keep track of those as well. Jose was sometimes referred to as "Pato" or "Lucas" by other callers. Guillermo was associated with the nicknames " 'Chapetes,' 'Aurelio,' 'Aure,' [and] 'Greda.' "

---

[6] Only 39 calls were played at trial, but the transcripts and audio of all 87 calls were available to the jurors during deliberations.

*2. The RV*

Herrera first observed the RV in the driveway of the Gilroy house on December 16, 2008. That night, he placed a battery-operated GPS tracking device on the undercarriage of the RV. After returning to the office, Herrera learned that they were not getting a signal from the device, so the following night, he returned to the property and placed a second transmitter on the RV. Between December 16 and December 20, Herrera observed Jose and other members of the DTO, including Jose Melendez-Ramirez and his wife Virginia Melendez-Ramirez,[7] around the RV at a gas station, an auto parts store, and a shopping center. It appeared that they were preparing the RV for an excursion. Herrera did not see the RV again after December 20, 2008 and at some point thereafter the GPS tracking devices stopped working.[8]

On January 19, 2009, Douglas County (Nebraska) Sheriff's Deputy Jason Bargstadt conducted a traffic stop of the RV on Interstate 80 near Omaha. Jose Melendez-Ramirez was driving the RV and Virginia Melendez-Ramirez and their daughter, Virginia, Jr., were passengers. Bargstadt found it unusual for an RV to be traveling on the interstate during the winter months since they have exposed water lines that will freeze and damage the vehicle. Because Interstate 80 is a known drug trafficking corridor, Bargstadt suspected that the Melendez-Ramirezes were involved in criminal activity. Bargstadt searched the RV and noticed some aftermarket modifications, which ultimately led him to a trapdoor in the RV's bedroom. Beneath the trapdoor was a compartment with 100 one–kilogram bundles of cocaine individually wrapped in green cellophane.

---

[7] The Melendez-Ramirezes were the registered owners of the RV.

[8] Herrera could not recall the date on which the devices stopped transmitting.

### 3. The "takedown"

At around 7:00 a.m. on March 18, 2009, law enforcement officers conducted a "takedown"[9] of the DTO. In the course of the takedown, a total of 16 individuals were arrested including the three defendants.

The three defendants, along with three other adults, were arrested at the Rosemere stash house—a two-story residence, with four bedrooms, two-and-a-half baths, and a three-car garage. DEA Special Agent Anthony Guzman was responsible for "logging in all the evidence found in the residence." In a locked upstairs bedroom, officers found 42 one-kilogram bundles of suspected cocaine in a closet along with FoodSaver plastic bags, a vacuum sealer, plastic containers, and dryer sheets. On the lower shelf of a table in that same room, officers discovered $618,328 bundled in heat-sealed wrap plus another $152,315 in loose currency inside a dresser drawer. Inside the same dresser, they found plastic gloves, marking pens, scissors, tape, and box cutters. Officers seized a black notebook which was used as a "pay/owe ledger" on top of the dresser, along with a money counter.

Within the upstairs master bedroom, officers discovered a .45-caliber handgun, two magazines, five rounds of .45-caliber ammunition, and a pair of night-vision goggles. In the kitchen oven, officers found an "Intratec" handgun, equipped with a silencer.[10] Officers recovered a total of 23 cell phones from the residence.

In the garage, officers searched a BMW, a Toyota 4Runner, and an Acura. The 4Runner had a hidden compartment in the rear bumper containing "43 kilos of suspected cocaine" and "two trays of crystal methamphetamine." Both the BMW and the Acura also had hidden compartments, but those compartments were empty.

---

[9] A takedown involves serving search and arrest warrants on multiple persons at multiple locations simultaneously.

[10] Guzman testified that "the magazine was inserted backwards" in this handgun.

*4. Cooperating witness Flor Gamboa*

Gamboa testified pursuant to a cooperation agreement after pleading guilty to multiple felonies arising from her participation in the DTO. According to the agreement, Gamboa faced 50 years eight months in prison if she did not testify " 'truthfully and completely.' "

Gamboa began working for the DTO in 2007 as a driver, traveling to Los Angeles with money and returning to the Bay Area with drugs. All of the vehicles she drove had hidden compartments in which the money and the drugs were concealed. Gamboa believed the compartments could hold 40 to 50 kilos of drugs and perhaps as much as $3 million, but she never touched anything in the compartments. She was paid $5,000 for each round trip and sometimes she made $60,000 in a month. Other months Gamboa would only make $10,000 or $20,000. Later, Gamboa's job was to arrange property rentals for the DTO, using friends or family members to sign the paperwork, and obtain driver's licenses for the drug couriers.

Jose, who was in charge of the DTO, was Gamboa's boyfriend. In March of 2009, she lived with her daughter and Jose at an apartment on La Strada Drive (La Strada apartment) in San Jose. Gamboa paid a friend, J.G., to rent the La Strada apartment for her. J.G. also rented the Rosemere stash house for Gamboa, but J.G. did not know anything about the DTO.

Jose hired people to manage the DTO's stash houses and paid them $10,000 per month. The house manager was responsible for loading and unloading the vehicles, counting the money, and keeping track of all the cash and the drugs. Jose mostly hired relatives to work for the DTO, with the exception of Gamboa, Martin Villalobos, Eduardo Gonzalez also known as "Guero," and Jose Melendez-Ramirez. Guillermo was Jose's cousin and worked first as a house manager then as a courier.

Gamboa testified that everyone in the DTO had at least two cell phones, a personal phone and a work phone, and they changed cell phones every few months to protect

11

themselves from law enforcement surveillance. When talking about drugs, they always spoke in code. Gamboa testified that Jose also went by "Pato," "Francisco Javier Oliva," " 'Pariente,' " and " 'Lucas.' " Guillermo was also known as "Aure," "Aurelio," "Chapete," and "Greda." Emanuel's nicknames included "Monkiki" and "Gordo." Gamboa herself went by "Jessica Maria Acevedo"[11] at times.

When asked about the RV, Gamboa said that Jose paid for the vehicle, but Melendez-Ramirez and his wife, Virginia, were the registered owners. The RV was stored at the house in Gilroy, since the property was large enough to park it. Gamboa rented that property, under the name "Jessica Acevedo," for Melendez-Ramirez and his family. Jose hired Melendez-Ramirez to drive the RV, "[b]ecause they [i.e., Virginia and Jose Melendez-Ramirez] look like a reliable couple . . . [y]ou wouldn't think [were] transporting drugs." Jose used the RV to transport drugs to Atlanta, where the prices were "way higher" than in San Jose. Gamboa testified that the RV made two or three trips to Atlanta before it was stopped in Nebraska in January 2009.

Gamboa testified that the DTO had only been using the Rosemere stash house for a few months before it was raided by the DEA. She did not have keys to that house and only went there when Jose directed her to do so. Emanuel, Villalobos, and Jose were the only people who had the key to the locked bedroom upstairs.

The DTO usually changed the location of its stash house every year, but members of the DTO were allowed inside "[i]f you had business there." Customers were never permitted at the stash houses and the locations were kept a secret to prevent theft.

Before Gamboa arranged for the rental of the Rosemere stash house, the DTO's stash house had been located on Mission Creek in Fremont. In August 2008, someone

---

[11] When Gamboa first entered the United States at the age of nine, she was given a birth certificate showing her name as "Jessica Maria Acevedo Garcia." She subsequently used that false birth certificate to obtain a driver's license, passport, and other official documents.

12

stole a large sum of money—perhaps more than $1 million—as well as a vehicle and possibly some methamphetamine from the Mission Creek stash house. Jose suspected that Gonzalez, who had been one of the Mission Creek house managers until Jose fired him three or four weeks before the theft, and some of Gonzalez's friends were responsible. Jose had everybody in the DTO, including Gamboa, take a lie detector test. Jose also called Gonzalez over to the Mission Creek stash house to take a lie detector test. According to Gamboa, after Gonzalez took the test, someone nicknamed Chino[12] and two other men beat Gonzalez up. Chino and the other two men were Vietnamese. After Gonzalez left, Jose told Gamboa that Gonzalez, despite the beating, denied being involved in the theft.

Jose suspected that Luis Lopez was also involved, because Gonzalez moved in with Lopez after he moved out of the Mission Creek stash house. Jose, Guillermo, Hugo, Tony, Emanuel, and Gamboa planned to kidnap Lopez, "beat the crap out of him, make him tell us who or where was the money, [*sic*] and maybe [] even [kill] him." Jose would arrange to meet Lopez at a restaurant and then take him to the La Strada apartment. Chino and some of his men would be at the apartment and they would beat Lopez. According to the plan, Gonzalez, who had fled to Mexico, would be kidnapped at the same time as Lopez. Gamboa testified that Jose and the others discussed possibly killing Gonzalez, too.

Gamboa was at the Rosemere stash house with her daughter and Martin when she learned that Jose "and the group" were coming over with Lopez. Jose told her to "go to the movies," so she and her daughter, as well as Martin, left the house. When she returned, Gamboa saw Lopez "for a brief second" in the pantry, and Jose, Guillermo,

---

[12] Gamboa testified that Chino was one of Jose's "business associate[s]."

Alejandro Ramirez,[13] and Emanuel were there as well. Lopez was in the house for two or three days and there "was a lot of tension." Gamboa testified they had the television volume up so "[Lopez] wouldn't hear what we would talk about." Jose told Gamboa that Lopez "got beat up" at the La Strada apartment before they brought him to the Rosemere stash house. Emanuel said he had kicked Lopez in the testicles, and Ramirez was complaining that his hand hurt from punching Lopez. Once at the Rosemere stash house, however, "nobody touched [Lopez]." The night before the DEA raid, Lopez ate takeout with everyone and was released.

The next morning, Gamboa woke up to a loud noise and heard someone yell, " 'D.E.A., open the door.' " At the police station, she asked about Jose, and Officer Varela told her Jose would get a life sentence because of " 'the murder and kidnapping.' " Gamboa was distraught so she told them that Lopez was alive and also told them where he lived. When the DEA offered her a deal that day in exchange for her cooperation, she initially turned them down and went to jail.

Gamboa listened to audio recordings of wiretapped calls and identified Jose's voice on exhibit 1, file Nos. 10, 13, 91, 237, 436, 481, and 1749. She also recognized Emanuel's voice on No. 13.

### 5. *Evidence relating to the kidnapping*

Luis Lopez lived with Gonzalez from August 2008 to October 2008 when Gonzalez moved to Mexico. Lopez knew that Gonzalez had been working with Jose.

In August 2008, Jose telephoned Lopez and accused him of stealing money. According to Lopez, Gonzalez also got a call from Jose "about the money that had gotten

---

[13] Although listed in the indictment as "Alejandro Rocha aka Carnaria, Tocano," in some pretrial hearings this individual was referred to as "Alejandro Ramirez." On the court's own motion, we have taken judicial notice of the record in his pending appeal from his separate trial, *People v. Alejandro Ramirez* (H043461), at which he was also referred to as Alejandro Ramirez. For the sake of consistency, we will refer to him herein as Ramirez, as well.

lost." Jose told Lopez that $2 million had been taken and if Lopez and Gonzalez simply returned the money, Jose would give them $150,000 apiece. Lopez denied knowing anything about the money. The next day, Lopez saw Gonzalez and it appeared that Gonzalez had been beaten up.

In March 2009, Lopez and Jose made plans to meet at a restaurant and talk about the missing money. Lopez drove his motorcycle to the restaurant and waited for Jose in the parking lot. When Jose arrived, Lopez got into his pickup truck to talk. Jose began driving and eventually pulled into the garage underneath a townhouse. Lopez asked what was going on and Jose told him he just needed to pick something up.

Lopez followed Jose into the residence into the kitchen where he saw three or four other people standing there. Their faces were covered with black masks and three of them were holding "high-caliber weapons." Lopez saw that one of the weapons was equipped with a silencer. No one said anything to him and the masked men began to beat him, a couple of times with their weapons, hitting him in the face and knocking him to the floor. The men secured Lopez's wrists and ankles with zip ties and put tape over his mouth. Two of the men, in "Asian"-accented English, asked Lopez for the $2 million and told him they would kill him if he did not give it to them.

The men took Lopez's phone, wallet, and the keys to his motorcycle. They looked through Lopez's cell phone to see who he had been in contact with, and told him that Gonzalez needed to return the money. At some point, the men covered Lopez's head, possibly with a pillowcase.

After about four hours, the men loaded Lopez into the trunk of a car inside the garage and drove away. After 30 to 45 minutes, the car stopped and the men opened the trunk. Lopez had managed to partially remove what was covering his head and saw that he was inside a different garage. The men put the head covering back in place and carried Lopez through an interior door into a house, placing him into a small room.

15

Lopez was in that small room next to the kitchen for three days. The first day, two of the men beat him again, while his head was still covered, punching and kicking him in the face and body. They again asked him for the money, but Lopez said he "had nothing." Eight to 10 hours later, the men returned and beat him again. The men asked for the money and then left.

The second day, Lopez was beaten again and this time someone, perhaps Emanuel, stomped on Lopez's groin. Emanuel also kicked Lopez twice and hit him in the face once while asking him about the money.

On the third day, Guillermo took the bag off Lopez's head, cut the zip ties, and removed the tape over his mouth. Guillermo gave Lopez something to eat and drink and then used some rope to tie Lopez's hands in front of his body. Jose came in later that day and asked Lopez where the money was. Jose also asked if Lopez was willing to go to Mexico and talk to Gonzalez to "get things cleared up." Lopez, who was worried about his family, agreed to do so.

Lopez was let out of the small room, and he sat down at the kitchen table with Jose, Guillermo, and Emanuel to eat. Jose asked Lopez to forgive him, saying " 'I blew it.' " Guillermo also asked for forgiveness, but Emanuel did not. Lopez asked about his motorcycle and Jose told him they had pushed it over a cliff near Livermore. Jose gave Lopez $5,000 and told him he would pay for the motorcycle.

Guillermo, Emanuel, and Ramirez put a bag over Lopez's head again, and put him in a vehicle. They drove him to the place where they had disposed of his motorcycle before dropping him off near his house around 10:30 or 11:00 p.m. Lopez did not report the kidnapping to the police because he did not want any "problems" with "Jose and his brother and his cousin."

On March 20, 2009, San Jose Police Department Officer Rafael Varela, who was assigned to the DEA as part of the investigation into the DTO, interviewed Lopez at his apartment. Lopez appeared nervous and "his hands were shaking." The interview lasted

16

about three hours, and afterwards, Lopez got in a car with officers and confirmed the location of the townhouse where he was initially attacked and bound.

Based on the interview with Lopez, Herrera secured additional search warrants for the La Strada apartment and Rosemere stash house in order to look for biological evidence establishing that Lopez had been held there. Those warrants were executed on March 21, 2009. At the Rosemere stash house, a crime scene investigator searched for evidence related to a potential kidnapping, such as a hood, duct tape, zip ties, as well as possible bloodstain evidence in the kitchen pantry where Lopez was held. The investigator found three bloodstains and some used duct tape inside that pantry. In a trash can, the investigator found a zip tie, a rope, a water bottle, and an "El Mexicano Yogurt drink bottle."[14] Three other zip ties were discovered in a box outside the house. Inside a box in the garage, the investigator found a roll of unused duct tape and some gloves. Also in the garage, the investigator discovered a gray shoe bag, which was large enough to fit over someone's head.

The evidence collected at the Rosemere stash house, as well as bloodstains discovered in the trunk of one of the vehicles, was analyzed for DNA. Lopez's DNA was a match with the DNA found in the bloodstains in the pantry, the trunk, as well as on the shoe bag, the rope, and the zip ties. Emanuel was identified as a possible minor contributor of DNA on the shoe bag, on the rope, and on the three zip ties. Guillermo was identified as a possible contributor to the DNA found on the three zip ties.

## II. DISCUSSION

### A. Arguments regarding wiretap authorizations

#### 1. Relevant background

In December 2008, February 2009, and March 2009, the superior court authorized three wiretaps on target phones associated with defendants. DEA Special Agent Patrick

---

[14] Lopez testified that Guillermo gave him a "[s]trawberry El Mexicano" yogurt.

Donlin filed a lengthy declaration in support of the wiretap applications. In his declaration, Donlin asserted that probable cause existed to believe that "the wire and cellular telephone communications to be intercepted will tend to establish the guilt and involvement" of the identified individuals "in the possession, sales, distribution and manufacturing of methamphetamine and/or cocaine."

Donlin believed that the defendants were using their phones to facilitate the ongoing DTO. He described what police knew about the DTO by detailing Jose's involvement in drug trafficking beginning in 2003. In 2003, DEA agents had obtained a wiretap on a phone being used by Fernando Ayala, "a large-scale, Los Angeles-based cocaine trafficker." The agents intercepted two calls from Jose to Ayala offering to "purchase 50-100 kilograms of cocaine." In December 2004, Arizona police stopped a silver BMW and, after a canine unit alerted to the presence of narcotics, the officers discovered a hidden compartment in the vehicle. The vehicle was registered to one of Jose's relatives and further investigation revealed that a second BMW was purchased at the same dealership on the same day by Jose (using an alias). The purchasers paid $110,000 in cash for the two vehicles.

In 2006, Juan Vargas-Alvarez, one of Jose's brothers, was arrested as part of a DEA sting operation. Juan had provided an undercover officer the keys to his pickup truck and the officer, who had previously been given $900,000 to obtain 400 kilograms of cocaine, was tasked with returning the truck and cocaine to Juan. After the cocaine was loaded into the truck, the officer drove it to the agreed-upon location and left it in a parking lot, with the keys hidden on the floorboard. Officers observed Juan retrieve the keys and drive away. He was then stopped by the CHP and arrested. A search of the cell phones in his possession showed that Juan was in contact with Jose shortly before and after he got into his truck.

In a section of the wiretap application concerning "Necessity and Exhaustion," Donlin described other investigative techniques "which have been used or have been

18

considered in this investigation to date," including: use of undercover agents and confidential sources, physical visual surveillance, search/arrest warrants, pen registers and analysis of toll records, interviews of suspects in custody, consensual recordings, trash searches, analysis of financial records, and pole cameras. Donlin concluded that these efforts had not succeeded to date and were unlikely to succeed.

Donlin determined that further use of confidential informants would be unlikely to succeed because it was "unlikely" the informants would be "put in a position to identify" the identities of other conspirators, or the inner workings of the DTO.

Prior to trial, defendants moved to compel discovery of the sealed attachments supporting the wiretap, which contained information about the confidential informant or informants who had provided information about Jose and the DTO. The prosecutor opposed the motion and filed supporting declarations from Donlin and Herrera in which they averred that unsealing the materials would endanger the lives of confidential sources and compromise other law enforcement investigations. Following a hearing, the court denied the discovery motion finding that the prosecution could "limit the disclosure of the identity of the confidential informants and the contents of the sealed [wiretap] affidavits."

On September 24, 2010, defendants moved to suppress the evidence obtained from the wiretaps, arguing that the redacted materials supporting the initial wiretap (No. 08-13) did not establish probable cause and the subsequent wiretaps (Nos. 09-01, 09-02) as well as all evidence seized in this case were thus " 'fruit of the poisonous tree.' " In opposition, the prosecutor urged the trial court to conduct an in camera hearing during which it could review the sealed declarations and examine any witnesses it deemed necessary before ruling on the defendants' motion.

At the initial hearing on November 16, 2010, the trial court advised the parties it would conduct an in camera review in order to determine: (1) "whether the redactions are proper or whether more information should be disclosed; [and]" (2) "whether

19

considering the entire affidavit or application . . . there is an adequate showing of probable cause to validate the wiretap." The court asked that defense counsel "advise the [c]ourt of any questions they wish to have asked of any officers, agents, or confidential informants in an in-camera review." Defendants did not submit any questions to the court.

At a subsequent hearing in March 2011, the trial court ruled that, after "conduct[ing] the in-camera review" and taking testimony from "agents and/or informants as necessary," it found good cause to limit disclosure to the defendants due to the "possibility of violence or retaliation to the confidential informants and/or their families, if any." However, it also determined that certain specified portions of the redacted affidavits could be safely disclosed and ordered that the prosecution do so. The trial court also denied the defendants' motion to suppress finding that "the applications set forth [sufficient] probable cause" to support the wiretap authorizations.

After several months, defendants moved to traverse and quash the wiretap authorizations, again seeking to have the supporting documents unsealed. The trial court indicated that it would conduct in camera review as it "deem[ed] appropriate" to address the motion and again invited counsel to submit questions.

The court denied the motion in a written order dated July 27, 2012. In its order, the court stated that it held an in-camera hearing on the motion on an "unspecified date" during which it called DEA agents and one or more confidential informants and "asked some or all of the questions" submitted. The court concluded that the "wiretap applications do not include false statements made knowingly and intentionally or with reckless disregard for the truth," and therefore there was no "reasonable probability that [defendants] would prevail on a motion to traverse." The court also found that the facts set forth in the sealed and unsealed documents "provided probable cause to believe the target subject was in the business of narcotics sales, the wiretaps would intercept communications regarding narcotics sales, and the target subject would be

20

communicating through the intercepted lines." The court concluded that "normal investigative procedures were unlikely to succeed and would have jeopardized the ongoing investigation, and therefore the wiretaps were necessary to investigate the target subject's criminal enterprise." The court restated its previous determination that the documents were properly sealed and "must remain so."

### 2. *Applicable legal principles*

"In general, California law prohibits wiretapping." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195; § 631.) A court may authorize a wiretap if the application contains facts showing that "there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and '[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous' (§ 629.52, subd. (d) . . . )." (*People v. Leon* (2007) 40 Cal.4th 376, 384.)

Section 1534, subdivision (a) specifies that the contents of a search warrant, including the supporting affidavit, become public record once the warrant is executed and returned. Recognizing the need in some cases to protect the identity of a confidential informant, the California Supreme Court laid out the procedures for trial courts to follow to determine whether some portion—or even the entirety—of a search warrant affidavit may remain sealed. (*People v. Hobbs* (1994) 7 Cal.4th 948, 971-975 (*Hobbs*).) "The procedures outlined in *Hobbs*, *supra*, [] to protect privileged information apply not only to search warrants, but also to wiretap authorization orders." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1054 (*Sedillo*).) On appeal, we review the trial court's rulings for abuse of discretion. (*Hobbs*, *supra*, at p. 976; *Sedillo*, *supra*, at p. 1055.)

21

"On a properly noticed motion by the defense seeking to quash or traverse the search warrant, the lower court should conduct an in camera hearing pursuant to the guidelines set forth in [Evidence Code] section 915, subdivision (b), and this court's opinion in [*People v.*] *Luttenberger* [(1990)] 50 Cal.3d [1,] 20-24." (*Hobbs*, *supra*, 7 Cal.4th at p. 972.) "It must first be determined whether sufficient grounds exist for maintaining the confidentiality of the informant's identity. It should then be determined whether the entirety of the affidavit or any major portion thereof is properly sealed, i.e., whether the extent of the sealing is necessary to avoid revealing the informant's identity." (*Ibid.*)

"If the affidavit is found to have been properly sealed, and the defendant has moved to traverse the warrant, the court should then proceed to determine whether the defendant's general allegations of material misrepresentations or omissions are supported by the public and sealed portions of the search warrant affidavit . . . . Generally, in order to prevail on such a challenge, the defendant must demonstrate that (1) the affidavit included a false statement made 'knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.' " (*Hobbs*, *supra*, 7 Cal.4th at p. 974.) "If the trial court determines that the materials and testimony before it do not support defendant's charges of material misrepresentation, the court should simply report this conclusion to the defendant and enter an order denying the motion to traverse." (*Ibid.*)

"[I]f the affidavit is found to have been properly sealed and the defendant has moved to quash the search warrant [citation], the court should proceed to determine whether, under the 'totality of the circumstances' presented in the search warrant affidavit . . . , there was 'a fair probability' that contraband or evidence of a crime would be found in the place searched pursuant to the warrant. [Citations.] In reviewing the magistrate's determination to issue the warrant, it is settled that 'the warrant can be upset only if the affidavit fails as a matter of law . . . to set forth sufficient competent evidence

supportive of the magistrate's finding of probable cause, since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony.' " (*Hobbs*, *supra*, 7 Cal.4th at p. 975.)  Similarly, "[a] wiretap must be supported by a finding of probable cause, necessity, and minimization." (*Sedillo*, *supra*, 235 Cal.App.4th at p. 1055.)  "If the court determines, based on its review of all the relevant materials, that the affidavit . . . furnished probable cause for issuance of the warrant . . . [citation], the court should simply report this conclusion to the defendant and enter an order denying the motion to quash." (*Hobbs*, *supra*, at p. 975.)  "In all instances, a sealed transcript of the in camera proceedings, and any other sealed or excised materials, should be retained in the record along with the public portions of the search warrant application for possible appellate review." (*Ibid*.)  On appeal, we review the trial court's rulings for abuse of discretion. (*Id*. at p. 976; *Sedillo*, *supra*, at p. 1055.)

### 3. Analysis

Defendants claim the trial court erred by relying on Evidence Code sections 1040 through 1042 and the procedure set forth in *Hobbs*, *supra*, 7 Cal.4th 948 to evaluate their motion to compel discovery of the unredacted documents supporting the wiretap authorizations.

We disagree.  Defendants completely overlook two published decisions, i.e., *Sedillo*, *supra*, 235 Cal.App.4th 1037 and *People v. Acevedo* (2012) 209 Cal.App.4th 1040 (*Acevedo*), which have expressly held to the contrary.  Defendants do not cite *Sedillo* or *Acevedo* in their briefing, let alone attempt to explain why this court should not follow their reasoning.

We find the analysis in *Sedillo* and *Acevedo* compelling.  A defendant's right to challenge the affidavit supporting a wiretap authorization or right to disclosure of the entirety of its contents cannot be absolute but rather must be balanced against the "privileges that protect official information and the identity of confidential informants."

23

(*Acevedo*, *supra*, 209 Cal.App.4th at p. 1055.) The procedures set forth in *Hobbs* strikes that balance thereby " 'assur[ing] the defendant[s] of a judicial check on possible police misrepresentations, while preventing both unfounded fishing expeditions and inadvertent revelations of the identity of confidential police informants.' " (*Acevedo*, *supra*, at p. 1057.) As a result, we find that the trial court did not err in applying Evidence Code sections 1040 through 1042 and the procedure set forth in *Hobbs* in evaluating defendants' motion to compel disclosure of the affidavits supporting the wiretap authorizations.

Defendants have also asked that this court independently review the sealed materials related to their motions to unseal, quash, and traverse the wiretap authorizations as well as their motion to suppress the wiretap evidence. The Attorney General did not object to this request.

We have reviewed the sealed and public portions of the wiretap affidavits. We conclude that the court properly ordered the sealed portion of the transcript to remain sealed to protect the identity of the confidential informant(s). (*Hobbs*, *supra*, 7 Cal.4th at pp. 972-973.) Additionally, we find that under the totality of circumstances presented in the affidavits, there was a fair probability that communications concerning the crimes would be found pursuant to the wiretaps. (*Hobbs*, *supra*, at p. 975; *Sedillo*, *supra*, 235 Cal.App.4th at p. 1055.) Therefore, the court properly denied defendants' motions to quash and traverse the search warrant and suppress evidence.

*B. Motion to suppress evidence obtained through GPS tracking device*

Jose claims that the trial court erred in denying his motion to suppress evidence seized as a consequence of the installation of GPS vehicle trackers on the RV, because that vehicle was parked within the curtilage of the Gilroy residence. We conclude that the driveway of that residence was not within the curtilage of the residence and that placing the GPS devices on the RV did not violate the Fourth Amendment.

24

*1. Relevant background*

Jose moved to suppress the evidence discovered during the search of the RV following the traffic stop in Omaha, Nebraska, arguing that agents "invad[ed] the curtilage" of the Gilroy residence while placing GPS trackers on that RV. The RV's subsequent detention in Nebraska was unlawful, according to Jose, because it was the "illegally attached" GPS tracking devices which led the DEA to connect Jose Melendez-Ramirez to the RV and create a profile for him in the DEA database as a suspected drug trafficker.

In opposition, the prosecutor asserted that Jose did not have standing to challenge: (1) the entrance onto the Gilroy property, as well as the placement of the GPS devices; or (2) the detention of the RV in Nebraska.

*a. Evidence regarding Jose's privacy interest in RV*

At the November 27, 2012 hearing on the motion to suppress, Jose testified regarding his privacy interest in the RV. According to Jose, he purchased the RV in October 2008 along with the Melendez-Ramirezes. Jose paid $90,000 of the $134,000 purchase price and the Melendez-Ramirezes paid the balance. The RV was registered to the Melendez-Ramirezes because Jose "knew that the RV was going to transport drugs" and he did not want his name associated with it. However, Jose paid for all the maintenance on the RV, including purchasing new tires.

As to the Gilroy residence, Jose testified that he directed Gamboa to rent it in November 2008. Jose told Gamboa to rent a "stand alone" house with a fence encircling the entire property. Jose paid the rent and all of the utility bills for the property. He slept overnight at the Gilroy residence twice and had the only set of keys to it, but no one "actually live[d]" in the residence until December 2008. Jose initially planned to live in the Gilroy house himself, but in December 2008, he allowed the Melendez-Ramirezes to move in.

Following Jose's testimony, the prosecutor introduced several exhibits including: (1) subpoenaed documents from the RV dealership that sold the RV; (2) rental records for the Gilroy residence; and (3) a DMV printout of the RV's registration history.

After reviewing the evidence, the trial court found that Jose had demonstrated by a preponderance of the evidence that he had standing to "assert Fourth Amendment violations as to the RV for both the GPS installation and the stop in Nebraska."

*b. Evidence regarding attachment of GPS devices*

In November 2008, agents learned of the Gilroy residence and the RV, which corroborated information they had received from confidential informants, as well as Jose's discussion of an RV in several wiretapped conversations. The RV was registered to Virginia and Jose Melendez-Ramirez.

On November 26, 2008, Donlin and another DEA agent conducted surveillance at the Gilroy residence, taking photographs of the residence and an RV parked in the driveway. A wrought iron fence, with a pedestrian gate and driveway gate, ran along the front of the property.

At around 2:00 a.m. on December 16, 2008, Donlin, Herrera, and a third DEA agent drove to the Gilroy residence and parked by an orchard on the adjacent property to the west of the Gilroy property. The agents crossed a culvert which appeared to separate the two properties and approached the Gilroy property from the west. There was no fence separating the properties and the grass in the area was "muddy" and "unkempt," unlike the manicured lawn in the front of the Gilroy residence. There were no signs posted warning against trespass.

The agents approached the 136-foot driveway which extended all the way from the street, made a right turn at the corner of the residence, and ended at a detached garage. The RV was parked in the driveway, with its rear end approximately 30 feet from the garage and its front end approximately seven feet from the closest point of the residence

26

itself. The driveway was illuminated by a light attached to a utility barn on the western edge of the driveway.

While the other agents kept a lookout, Herrera crawled under the RV and affixed a battery-powered GPS tracking device on its undercarriage. Herrera estimated it took him about two minutes to attach the device, after which the agents retraced their steps to leave the property.

That same morning, Herrera logged into the GPS tracking software and learned that the tracking device was not sending a signal, so he and Donlin, along with a Santa Clara County sheriff's deputy, Josh Singleton, returned to the Gilroy residence around 11:00 p.m. The three men parked in the same location as before and again entered the Gilroy property from the west. Herrera and Singleton went under the RV, where Herrera repositioned the first tracking device so that the antenna was closer to the outside of the vehicle while Singleton attached a second GPS tracking device.[15] Again, it took approximately two minutes to both reposition the first device and place the second one. The next morning, Herrera confirmed that both tracking devices were "emitting their location."

Over the next few days, Herrera and other agents maintained surveillance on the Gilroy property. Herrera believed that, based on intercepted telephone calls and activity observed in and around the RV, the DTO was preparing the RV to travel to Los Angeles to pick up drugs. At around 10:15 a.m. on December 20, 2008, Donlin and Herrera were notified that the tracking devices showed the RV was moving. Using the GPS signal, Herrera and Donlin located the RV at a gas station in San Martin. They observed Jose and Melendez-Ramirez pumping gasoline into the RV and filling the propane tanks.

---

[15] Singleton testified that Herrera worked on the first transmitter "towards the back of the vehicle" while he went up "a little bit further towards the front . . . [and] crawled underneath it" to place the second transmitter.

The agents then followed the RV to a parking lot at a shopping mall in Gilroy. Jose and Jose Melendez-Ramirez got out of the RV and began looking at the tires, climbing onto the roof and examining what looked like an air conditioning unit. A few minutes later, the agents saw Virginia Melendez-Ramirez and her daughter arrive in a separate vehicle and begin loading groceries into the RV.

After his surveillance of Melendez-Ramirez with the RV, Herrera created a profile for him in a DEA database which included a physical description and the following narrative: " '[A]ssisted Jose Vargas-Alvarez prepping RV for suspected run to Los Angeles for narcotics. Jose Melendez-Ramirez is suspected to be interstate driver for Jose Vargas-Alvarez.' "

On either December 22 or 23, 2008, agents learned through intercepted phone calls that Jose and Gamboa found and removed one of the tracking devices on the RV. Herrera believed the second tracking device stopped functioning sometime between January 1 and January 6, 2009. Agents conducted spot checks of the Gilroy property but the RV was not there and as of January 6, 2009, Herrera and the other agents had "no idea" where it had gone.

When Herrera returned to the property in preparation for the hearing on the motion to suppress, he observed that a fence had been installed along its western boundary. However, even that new fence would not have impeded their access to the property if it had been in place in 2008 because it did not extend all the way to the public road.

After hearing argument from the attorneys, the trial court denied the motion to suppress, finding that the RV was not parked within the curtilage of the Gilroy residence and that the agents entered the property through an "open field."

### 2. Applicable legal principles

#### a. Standard of review

The Fourth Amendment to the United States Constitution requires state and federal courts to exclude evidence from unreasonable searches and seizures. (*People v.*

*Williams* (1999) 20 Cal.4th 119, 125.) Section 1538.5 allows a defendant to move to suppress evidence obtained in an improper seizure. Our standard of review is well established. "In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings, express or implied, where supported by substantial evidence. [Citation.] And in determining whether, on the facts so found, the search was reasonable for purposes of the Fourth Amendment to the United States Constitution, we exercise our independent judgment." (*People v. Simon* (2016) 1 Cal.5th 98, 120.)

### b. Curtilage and open fields

The Fourth Amendment to the United States Constitution prohibits warrantless searches of places where someone has a reasonable expectation of privacy. (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 454.) In *Oliver v. United States* (1984) 466 U.S. 170, the United States Supreme Court "recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." (*United States v. Dunn* (1987) 480 U.S. 294, 300 (*Dunn*).) *Dunn* articulated the relevant factors a court should use to determine whether a location falls within the curtilage, including "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (*Id.* at p. 301.) However, "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." (*Ibid.*)

### 3. Analysis

Applying the *Dunn* factors to the facts of this case, we conclude the trial court was correct in finding that the RV was not encompassed within the curtilage of the Gilroy

29

residence and the agents did not violate the Fourth Amendment in accessing the property and placing tracking devices on that vehicle.

First, the proximity of the driveway to the Gilroy residence does not clearly weigh in favor of concluding that the driveway was part of the home's curtilage. The 136-foot long driveway extended from the public road, past the residence, and ended at a detached garage structure. The RV was parked on that driveway with its rear approximately 30 feet from the garage and its front approximately seven feet from the residential structure. Depending on whether the tracking devices were placed closer to the rear or the front of the 39-foot long vehicle—facts which are not precisely disclosed in the record—the agents were anywhere between 46 and seven feet from the residence when they crawled underneath the RV.

The second *Dunn* factor examines "whether the area is included within an enclosure surrounding the home." (*Dunn*, *supra*, 480 U.S. at p. 301.) This factor favors the prosecution. The agents testified that, while a 62-inch tall wrought iron fence ran the length of the front of the property, there was no fencing at all along its western boundary. Anyone entering the property from the west could walk unimpeded through muddy, unmown grass, across the driveway, past the RV, and reach the residence.

Third, the occupants of the Gilroy residence did not incorporate the driveway closely into the " ' "activity of home life." ' " (*Collins v. Virginia* (2018) 138 S.Ct. 1663, 1671 [2018 U.S. Lexis 3210].) The driveway was very long and was apparently the only paved access to the residence from the public road. However, there was no wall or other enclosure along the driveway for the agents to climb over to access the RV, nor was there any testimony that any doors from the residence provided direct access to any portion of the driveway where the RV was parked. (See *id.* at p. 1670 [driveway partially enclosed by "height of a car" brick walls with side door directly accessing that portion of driveway].) The driveway at the Gilroy residence was not an area to which " ' "the

activity of home life extend[ed]" ' " aside from a means of egress to the public road. (*Id.* at p. 1671.)

Finally, Jose did not take "steps" to "protect the area [of the driveway] from observation." (*Dunn, supra,* 480 U.S. at p. 301.) There were no "No Trespassing" signs posted anywhere on the property, there was no fence or other such structure along its western boundary, and even the fence along the front of the property was neither solid nor especially tall. There was no carport or other structure protecting the RV from view. Any activities the residents undertook on the driveway would have been visible as well. Nothing obstructed a pedestrian's path from the western side of the property to the driveway, aside from mud and tall grass.

Furthermore, even if the driveway itself were considered curtilage, "the law is clear that not every technical trespass onto the curtilage amounts to a search. Just like any other visitor to a residence, a police officer is entitled to walk onto parts of the curtilage that are not fenced off. 'Whether a driveway is protected from entry by police officers depends on the circumstances. The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy.' " (*People v. Zichwic* (2001) 94 Cal.App.4th 944, 953.)

As a result, the trial court did not err in denying Jose's motion to suppress evidence based on the placement of the GPS trackers on the RV at the Gilroy residence as he had no reasonable expectation of privacy in the driveway where that vehicle was parked.

*C. Suppression of evidence seized in detention of the RV in Nebraska*

Jose next argues claims that his motion to suppress should have been granted because the detention of the RV in Nebraska was unduly prolonged and that Jose Melendez-Ramirez was unlawfully detained at the time he consented to a search of the RV. We disagree, for two reasons. Contrary to the trial court, we find that Jose did not

have a privacy or property interest in the RV which would enable him to challenge the Nebraska traffic stop. But, even if he did, the stop was not unduly prolonged under the totality of the circumstances and Melendez-Ramirez's consent to search was valid.

### 1. Evidence regarding traffic stop of the RV in Nebraska

Douglas County Sheriff's Deputies Edward Vanburen and Jason Bargstadt testified at the suppression hearing regarding the detention of the RV on Interstate 80 in Nebraska. On January 19, 2009, around 1:00 p.m., Vanburen and Bargstadt were patrolling Interstate 80 as part of a "criminal interdiction" unit, specifically tasked with looking for anyone "using the interstate or highway system to commit major crimes[] [such as] trafficking in guns, stolen property, drugs, drug proceeds, terrorist activity, [etc.]"

Vanburen had worked as a trainer for that unit for 10 years and had been involved in "well over" 200 interdiction investigations over his career. He had completed over 300 hours of criminal interdiction training which covered a wide range of topics, including how to examine vehicles for evidence of criminal activity, such as hidden compartments, and how drivers and passengers may behave when contacted by law enforcement. In his training, Vanburen learned about common travel routes, driving patterns, as well as how to conduct traffic stops safely and efficiently. At the time of the stop, Vanburen was supervising five K-9 deputies, including Bargstadt. Bargstadt had also received training on criminal interdiction and had participated in over 100 such investigations since 2005.

Vanburen learned from a Nebraska State Patrol trooper stationed near Lincoln that a large motor home was travelling eastbound on Interstate 80. The trooper thought the vehicle was "slightly suspicious" and was "out of place for the area, date, and time, and season." Vanburen testified that "[v]ery few" RVs travel the highway during winter. Bargstadt elaborated that the icy roads are dangerous for vehicles of that size and an RV's water lines and tanks are subject to freezing.

32

Vanburen was driving westbound on Interstate 80, but turned around after he saw the RV traveling eastbound. He contacted Bargstadt, who informed him that he had also seen the RV and was following it. Less than a mile after Bargstadt began following the RV, he saw that it "began to veer out of its lane, . . . and drive onto the shoulder, crossing the white fog line with its dualie wheels." Bargstadt testified that driving on the shoulder was a violation of the Nebraska State Traffic Code. The RV drove on the shoulder for no more than 10 seconds before it corrected onto the roadway. However, perhaps 30 seconds later, it drifted onto the shoulder again for less than five seconds.

Based on the erratic driving, Bargstadt decided to conduct a traffic stop of the RV at 1:06 p.m. Vanburen, who had caught up to Bargstadt and the RV, pulled his vehicle behind them on the side of the highway around 1:07 p.m.

Bargstadt approached the passenger side of the RV and asked the driver, identified as Jose Melendez-Ramirez, to step out of the vehicle with his driver's license and registration so they could talk. After Jose Melendez-Ramirez exited the RV, Bargstadt informed him that he had stopped him for driving on the shoulder and asked for his license, registration, and proof of insurance. Bargstadt asked if he was tired, how long he had been driving that day, and whether he felt he was okay to continue driving. In accordance with Bargstadt's "common practice," he asked Melendez-Ramirez to come back to his patrol car while he wrote a citation and checked Melendez-Ramirez's documents so they could avoid standing outside in below-freezing weather.

Melendez-Ramirez climbed into the front passenger seat of Bargstadt's patrol car and their conversation in the vehicle was recorded. As Bargstadt filled out his reports log, ran the RV's registration through "state records," and conducted a criminal history check of Melendez-Ramirez, Bargstadt asked him about his trip. Melendez-Ramirez replied that he and his family were traveling to Kansas City, Missouri. Bargstadt was suspicious and asked why they were not taking Interstate 70, as that was the more direct route to Kansas City from California.

In the meantime, Vanburen contacted Virginia Melendez-Ramirez and her daughter in the RV and they invited him into the vehicle. Vanburen remained just inside the entrance and talked to them for approximately five minutes. He asked Virginia about their "travel itinerary" and she replied they were headed to Kansas City to visit her husband's cousins. Virginia said they were thinking of moving to Kansas City, but she had no relatives there, and that her husband was unemployed and recently had to sell his catering business.

About 1:13 p.m., Vanburen walked over to Bargstadt's patrol car and asked Jose Melendez-Ramirez to join him in his patrol car so that Bargstadt could complete an "EPIC check" of Jose. Once in Vanburen's vehicle, Melendez-Ramirez told him that they were traveling to Kansas City to visit both his cousins and his wife's cousins, even though Virginia had just told Vanburen she had no relatives in that city. When asked, Melendez-Ramirez could not provide his cousins' names or any contact information for them and said he had not seen them in five or six years. Melendez-Ramirez appeared surprised by these questions and told Vanburen they intended to stay with some friends, but again could not provide the names of these friends. Given that Melendez-Ramirez was traveling halfway across the country, Vanburen found it odd that he did not know the names of the people whom they were visiting. Despite having just told Vanburen that he had not seen his cousins in five or six years, Melendez-Ramirez then said that he had just been to Kansas City about a month ago. First he said that his wife was with him on that recent visit, but then he said that his daughter came with him. Vanburen asked Melendez-Ramirez about his employment and he replied that he owned a bakery, but it was "closed while he was out of town." Vanburen thought this was strange since Virginia had said he was unemployed and had recently sold his business. When confronted with this information, Melendez-Ramirez said that "he didn't tell her."

In the meantime, Bargstadt conducted the EPIC (El Paso Information Center) check and as he waited for the results, he had decided not to issue a citation for driving

34

on the shoulder, but would instead let Melendez-Ramirez continue his trip with a warning. The EPIC dispatcher informed Bargstadt at 1:16 or 1:17 p.m. that Melendez-Ramirez was under active investigation by the DEA. Bargstadt got the name of a DEA case agent from the EPIC dispatcher and attempted to contact the agent but was not successful.

According to Vanburen's notes, his conversation with Melendez-Ramirez lasted about four minutes. He got out of his car and walked up to Bargstadt's vehicle, telling him he was suspicious and he thought "that vehicle's loaded." Bargstadt informed Vanburen of the EPIC hit. At this point, based on the conflicting suspicious responses from Melendez-Ramirez and his wife about their travel plans, the indirect route to Kansas City, the fact they were driving an RV through Nebraska in the dead of winter, and the EPIC hit, Vanburen and Bargstadt suspected that the Melendez-Ramirezes were engaged in drug trafficking.

At about 1:19 p.m., Vanburen asked Melendez-Ramirez if there were any drugs, weapons, or large amounts of money in the RV. Melendez-Ramirez told Vanburen he could check the vehicle. Bargstadt gave Melendez-Ramirez a consent-to-search form, along with his license and registration, around 1:24 or 1:25 p.m. At Vanburen's request, Melendez-Ramirez read the form aloud before signing it at 1:26 p.m. or 1:27 p.m. Vanburen told Melendez-Ramirez several times, both before and after he signed, that he had the right to refuse consent to search and that he was free to leave. Vanburen also told him that he could withdraw his consent at any time during the search and tell them he wanted to leave. Vanburen also told Virginia that she could decline the search at any time and they were free to leave.

Melendez-Ramirez gave consent to search about 20 minutes after the stop commenced. Officers began searching the RV and ultimately discovered a hidden compartment in the floor of the vehicle containing 100 kilograms of cocaine.

*2. Applicable legal principles*

It is settled "that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." (*United States v. Padilla* (1993) 508 U.S. 77, 81.) "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " (*Minnesota v. Carter* (1998) 525 U.S. 83, 88.)

"[O]wnership of a vehicle is largely irrelevant to the question of whether a given defendant has standing to challenge the stop of that vehicle." (*United States v. Powell* (7th Cir. 1991) 929 F.2d 1190, 1194 (*Powell*).) *Powell* explained that, when examining a defendant's Fourth Amendment rights, courts must "distinguish between different government intrusions that implicate different constitutionally protected interests. Searches implicate expectations of privacy in the places or things searched. Possessory interests are often important in deciding who has standing to challenge a search because of our society's shared belief that, to a greater or lesser extent, ownership carries with it a right to exclude. Ownership creates, in other words, an expectation of privacy 'that society is prepared to recognize as "reasonable." ' [Citation.] The Fourth Amendment protects this expectation." (*Id.* at pp. 1194-1195.) "By contrast to the expectation of privacy in places and things implicated by a search, the interests implicated by a vehicle stop are motorists' 'freedom from random, unauthorized, investigatory seizures' [citation] and the interest in avoiding the 'substantial anxiety' [citation] these stops may create. Both these interests are personal to the driver and passengers in the car stopped, who have their travel interrupted by the sight of a state patrol cruiser or police car looming large in the rear view mirror, are detained on the side of the road, have their

identifying documents inspected by the trooper or policeman, and may even be asked to leave their vehicles for the duration of the questioning." (*Id*. at p. 1195.)

### 3. *Analysis*

The trial court found that Jose had a legitimate expectation of privacy in the RV implicated by the Nebraska stop because he had supplied $90,000 of the $134,000 purchase price and also paid to maintain the vehicle.

However, even assuming, as the trial court found, that Jose having supplied the money for the purchase of the RV and its upkeep were enough to establish ownership of the vehicle, it is undisputed that he was not in the RV when Deputy Bargstadt stopped the vehicle for driving on the shoulder. Because vehicle owners who are absent at the time their vehicle is stopped cannot challenge the stop, the trial court erred in concluding that Jose had standing to raise the instant Fourth Amendment claim.

Because "the intrusion a vehicle stop causes is personal to those in the car when it occurs," a vehicle owner, such as Jose, "who is not in his car at the time it is stopped should not, absent unusual circumstances not present in this case, have standing to object to the stop." (*Powell*, *supra*, 929 F.2d at p. 1195.) Jose, whose name did not appear on the vehicle registration and thus had no apparent ownership interest in the vehicle, essentially bestowed that vehicle upon the Melendez-Ramirezes for the purposes of their cross-country trip. We fail to see how these facts are not dispositive of his assertion of a reasonable expectation of privacy in the vehicle. Once the Melendez-Ramirezes began their trip, Jose had no (direct) control over where they went and what happened to the vehicle. The Melendez-Ramirezes could have sold, exchanged, or even abandoned the vehicle in Salt Lake City or Dallas or Alberta, Canada and Jose would have no legal recourse against them. Having set them up as strawmen owners to camouflage his interest in a vehicle he was using to smuggle drugs, it is incongruous to permit Jose to step in and assert a privacy interest when that vehicle is stopped and the smuggled drugs

37

are discovered. As a result, we find that Jose had no reasonable expectation of privacy in the RV and had no basis for moving to suppress the evidence seized in Nebraska.

However, even if Jose did have such a privacy interest, the trial court did not err in denying his motion to suppress because that traffic stop did not violate the Fourth Amendment.

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver [and passengers] 'even though the purpose of the stop is limited and the resulting detention quite brief.' " (*Brendlin v. California* (2007) 551 U.S. 249, 255.) "[I]nvestigative activities beyond the original purpose of a traffic stop, including warrant checks, are permissible as long as they do not prolong the stop beyond the time it would otherwise take." (*People v. Brown* (1998) 62 Cal.App.4th 493, 498.) However, "[c]ircumstances which develop during a detention may provide reasonable suspicion to prolong the detention." (*People v. Russell* (2000) 81 Cal.App.4th 96, 102 (*Russell*).)

In *People v. Arebalos-Cabrera* (2018) 27 Cal.App.5th 179 (*Arebalos-Cabrera*), a CHP officer observed defendant's tractor-trailer weaving and speeding on the freeway. (*Id*. at p. 184.) After he was pulled over, defendant handed "his driver's license, logbook, and paperwork for the trip" to the officer and exited the cab as requested. (*Ibid*.) The officer asked defendant about his logbook which showed defendant had not taken any trips in his vehicle for about a month and the officer believed that was unusual. Defendant appeared to be nervous during this conversation and, approximately five to 10 minutes after the stop, another CHP officer arrived. The second officer ran a check on defendant's driver's license and tractor-trailer, while the first officer had defendant perform a field sobriety test. Defendant did not appear to be impaired, so the officer returned his documents and said defendant was free to leave. As defendant began to walk back to the tractor-trailer, the officer asked if he could search the vehicle. Defendant consented to a search, "both orally and in writing." (*Ibid*.) Fifteen to 20 minutes had elapsed from the time defendant was pulled over to his giving consent to search.

A police dog trained to detect narcotics examined the tractor and found two secret compartments, one of which contained more than 10 kilograms of heroin and more than four kilograms of methamphetamine. (*Id.* at pp. 183-184.)

On appeal from the denial on the motion to suppress, the court concluded that defendant was not detained when he provided his consent to search and thus there was no Fourth Amendment violation. (*Arebalos-Cabrera*, *supra*, 27 Cal.App.5th at p. 185.) The court noted that the officer asked reasonable questions of defendant and conducted the field sobriety test for about 15 to 20 minutes. The second CHP officer did not engage in "any unusual show of authority." (*Id.* at p. 189.) "Because [the officer] had returned Arebalos's documents, told him he was free to leave, and allowed him to walk partway back to his vehicle, a reasonable person in Arebalos's position would in fact believe he was free to go when [the officer] asked for consent. Arebalos was no longer detained at that time." (*Ibid.*)

In this case, Melendez-Ramirez offered to let the officers search the RV when Vanburen asked if there were any drugs or weapons in it. After Melendez-Ramirez made that offer, Bargstadt gave him a consent-to-search form along with his driver's license and registration. As Melendez-Ramirez was reading the form aloud and before he signed it, Vanburen told him several times that he was free to leave, could refuse to allow officers to search the RV, and could even withdraw his consent after the search began. Because a reasonable person in the same position would believe he was free to go, Melendez-Ramirez "was no longer detained at that time." (*Arebalos-Cabrera*, *supra*, 27 Cal.App.5th at p. 189.)

Furthermore, Melendez-Ramirez's detention was not unduly prolonged. The officers held onto his driver's license and other paperwork only for the amount of time required to run those documents and for Bargstadt to run the EPIC check. From the time he was pulled over to the time he signed the consent form, approximately 15 to 20 minutes elapsed. The questioning was not, as Jose contends, an unauthorized "fishing

39

expedition" but rather consisted of reasonable questions regarding the Melendez-Ramirezes' itinerary and travel plans prompted in large part by the fact that it was highly unusual and therefore suspect for anyone to be driving an RV through Nebraska in mid-winter. In addition, all of this questioning took place while Bargstadt was checking the paperwork and calling EPIC.

Moreover, an officer may prolong a detention where developing circumstances give rise to reasonable suspicion. (*Russell*, *supra*, 81 Cal.App.4th at p. 102.) Reasonable suspicion arises when an officer has a " 'particularized and objective basis' " for suspecting the person has committed or is about to commit a crime. (*United States v. Arvizu* (2002) 534 U.S. 266, 273.) In evaluating an officer's claim of reasonable suspicion, the court looks to " ' "both the content of information possessed by police and its degree of reliability[,]" ' [citation] . . . tak[ing] into account ' "the totality of the circumstances . . . ." ' " (*People v. Brown* (2015) 61 Cal.4th 968, 981.)

In this case, the inconsistent and, in some cases unbelievable, answers that Jose Melendez-Ramirez and Virginia Melendez-Ramirez gave to Vanburen when he talked to them individually gave the officers a reasonable suspicion of criminal activity. Jose Melendez-Ramirez was visiting family and/or friends in Kansas City, but he could not recall anyone's name or contact information. He had not visited his cousins in several years, but then he had traveled to Kansas City about a month ago with his wife. Or perhaps it was his daughter. The RV was traveling on Interstate 80 to Kansas City from California, even though Interstate 70 was a more direct route. Jose Melendez-Ramirez owned a bakery, which was closed while he was gone, but according to Virginia, he was not employed and had recently sold his catering business. These inconsistent statements and the other circumstances, such as the incongruity of an RV with California license plates traveling through Nebraska in the middle of winter, combined with the deputies' training and experience in criminal interdiction, reasonably led them to believe that the

40

Melendez-Ramirezes were involved in drug trafficking and that further investigation was justified.

### D. Admission of wiretap recordings and transcripts

Defendants argue that admission of the numerous audio recordings that were not played in court and the accompanying transcripts violated the hearsay rule as well as their constitutional rights to due process and confrontation. We find that defendants have waived this argument by failing to object, but even assuming no waiver, the claim is without merit.

#### 1. Relevant background

Before trial, the prosecutor moved to admit the audio of the wiretap recordings and associated transcripts into evidence, and the trial court advised the parties that it would hold an Evidence Code section 402 hearing (402 hearing) prior to Dalida testifying in front of the jury regarding her identification of the voices on those recordings. The prosecutor stated he would call Dalida and Gamboa to lay the foundation for admission of the transcripts and recordings. Jose's counsel asked that all of the recordings "be played to the jury so that they can hear the voice sounds and in that way discharge their responsibility as . . . fact finders." When the prosecutor indicated his intent to play all of the recordings and provide the jury with transcripts which included Dalida's identifications of the speakers, Jose's counsel objected.

The court responded that the purpose of the 402 hearing was to determine if there was a sufficient basis to associate a particular voice with a particular defendant, and "[i]f it is a sufficient basis to go to the jury, then the appropriate way for introduction of evidence in a foreign language is exactly as counsel indicated, they get a binder and it has the designation of who stated what, that's already been—a foundation has already been laid. The jury's free to disagree with it, you're free to cross-examine on it." The court further cautioned that it would exclude the evidence "[i]f I don't believe the jury could reasonably conclude the foundational fact or authentication."

At the 402 hearing, Gamboa first explained how she knew the defendants before the prosecutor played 10 wiretap recordings and asked Gamboa to identify the voices on each call. Gamboa identified Jose's voice on nine of the calls, Guillermo's voice on one call, and Emanuel's voice on one call.

Dalida testified that "[a]bout 80 percent" of her job as a wiretap monitor "was to identify voices on a wiretap." To do so, she would rely on the phone numbers, the context of the conversations, the people with whom they spoke, distinctive vocal characteristics, and self-identification if it occurred. The court ruled that Dalida could offer her opinion to the jurors regarding the identities of the speakers and that defendants' objections to her authentication of the voices "go to the weight, rather than the admissibility" of that evidence.

At trial, Dalida testified that she had reviewed and prepared all of the transcripts contained in the wiretap binder, People's exhibit 32. When the court admitted the binder in evidence, it admonished the jurors that, although the transcripts identified individuals "as participants in the phone calls," that was "just for labeling purposes and for following [along with the audio]." The court reminded the jurors they were ultimately responsible for determining the identities of the participants on the calls. The prosecutor then played 39 of the 87 corresponding audio recordings. Dalida identified each defendants' voice on at least one call.

During Gamboa's trial testimony she identified Jose's voice on multiple calls and Emanuel's voice on one call.

### 2. Waiver

When a party raises an objection, the party is obligated to make some effort to obtain a ruling on that objection from the court. "[W]hen the point is not pressed and is forgotten the party will be deemed to have waived or abandoned the point and may not raise the issue on appeal." (*People v. Brewer* (2000) 81 Cal.App.4th 442, 461.)

It appears from the record the prosecutor intended to play all of the audiotapes in open court, and more importantly, defense counsel supported that course of action. For undisclosed reasons, the prosecutor only played certain recorded calls, but regardless, the court admitted the CD containing all of the audio files as well as the binder containing all of the transcripts of those calls, without objection. In fact, during closing argument, Jose's defense counsel urged the jurors to "listen to these tapes," without specifying any particular audio calls, and "draw your own conclusions."

Before the close of evidence, defendants should have requested that all the recordings be played in front of the jury and the transcripts read in open court. By failing to do so, we presume they were content to have the jury hear only those calls which were played and for the jury to have the entirety of the calls and transcripts for their review during deliberations.

### 3. *Defendants' claim lacks merit*

The trial court, in any event, did not err by allowing the jury to take the unplayed recordings and accompanying transcripts into the jury room. The exhibits were admitted in evidence in their entirety. The jury, therefore, was entitled to review them during deliberations. " '[The] law allows the jury to take with them into the jury room all exhibits except depositions.' " (*People v. Douglas* (1977) 66 Cal.App.3d 998, 1006.)

Defendants rely mainly on the Ninth Circuit Court of Appeal's decision in *United States v. Noushfar* (9th Cir. 1996) 78 F.3d 1442, but we find that case is inapposite. In *Noushfar*, undercover agents surreptitiously recorded a number of potentially incriminating conversations with the defendants. (*Id.* at p. 1444.) Over defense counsel's "vigorous objections," the lower court allowed the jury, while in deliberations, to listen to 14 tapes of those conversations—none of which had been played in open court. (*Ibid.*) The Ninth Circuit found this constituted structural error as it was a violation of the federal rule of criminal procedure which guaranteed the defendant a right to be present during the introduction of evidence against him and, "possibly, the

43

Confrontation Clause." (*Id.* at p. 1445; Fed. Rules Crim. Proc., rule 43(a).) By permitting the jury to listen, without instruction from the court, to recordings that had never been played in open court was "akin to allowing a new witness to testify privately, without cross-examination, to the jury during its deliberations" (*Noushfar*, *supra*, at p. 1445) and undermined "one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during the trial." (*Ibid.*)

With due respect to our sister federal courts, "the decisions of the lower federal courts are persuasive but not controlling." (*In re Tyrell J.* (1994) 8 Cal.4th 68, 79, disapproved on another ground in *In re Jaime P.* (2006) 40 Cal.4th 128, 139.) Furthermore, unlike the defendant in *Noushfar*, defendants here did not object to admission of the CD and transcripts into evidence, which permitted the jury to review them at their discretion while deliberating. Defense counsel also had every opportunity to question Dalida and Gamboa about the calls which were played, and certainly could have played all the other calls had they desired.

*United States v. Franco* (9th Cir. 1998) 136 F.3d 622 (*Franco*) is more analogous to this case. In *Franco*, the prosecution introduced audio tape recordings of approximately 110 conversations—all in Spanish—between several of the defendants. (*Id.* at p. 625.) The recordings were admitted in evidence, but not played for the jury in court. English-language transcripts were also placed in evidence, but only 18 of those were read in full to the jury. (*Ibid.*) However, all 110 transcripts were provided to the jury during deliberations. (*Ibid.*)

The Ninth Circuit distinguished *Noushfar* in part because the trial court in that case had sent the unplayed recordings to the jury " 'over vigorous objections,' " and the defendant in Franco had raised no objection in the lower court. (*Franco*, *supra*, 136 F.3d at p. 625.) By failing to object, the defendants had "acquiesced" in the challenged procedure. (*Id.* at p. 628.)

44

Under these circumstances, the trial court did not err in sending the CD and transcripts to the jury room.

*E. Ineffective assistance of counsel*

Defendants, recognizing that the failure to object may have resulted in waiver, argue their trial counsel rendered ineffective assistance. We reject this claim as well.

To establish ineffective assistance of counsel, defendants must show that counsel's performance was deficient *and* that they were prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To establish prejudice, it is defendants' burden to show a reasonable probability that, but for trial counsel's errors, the result would have been different. (*Id*. at pp. 217-218.) A reasonable probability is one " 'sufficient to undermine confidence in the outcome.' " (*Id*. at p. 218, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 693-694.)

As explained above, the CD containing the audio recordings and the entire binder of transcripts were admitted in evidence. As a result, those exhibits were properly considered by the jury. An attorney does not provide deficient assistance if he or she fails to make a meritless objection. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

Finally, however, assuming there was error, we conclude that defendants cannot show they were prejudiced thereby because the other evidence elicited at trial overwhelmingly supports the convictions returned by the jury. Under either the "harmless beyond a reasonable doubt" test applicable to federal constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)) or the "reasonable probabilities" test applicable to error under California law (*People v. Watson* (1956) 46 Cal.2d 818, 836-837), the claimed error in providing the jury with the CD and the accompanying transcripts is not sufficiently prejudicial to warrant reversal.

For example, Jose's kidnapping conviction was supported by Lopez's testimony that Jose arranged to meet with him then drove him to the La Strada apartment, where Lopez was beaten, bound, thrown into the trunk of a car, transported to the stash house,

45

then held in a kitchen pantry for two or three days.  DNA evidence connected Lopez to the pantry and to the trunk of the BMW.  Officers discovered zip ties and an empty strawberry yogurt container in the garage of the stash house.  Emanuel and Guillermo were convicted of misdemeanor false imprisonment based on this evidence, plus Lopez's testimony that he interacted with both of them while he was being held.  Gamboa's testimony corroborated Lopez's and she independently implicated all three defendants in the kidnapping plot.

Turning to the drug-related convictions, the evidence showed that all three defendants were present at the stash house during the takedown.  In the ensuing search of that location, officers discovered 85 kilograms of cocaine, over half a million dollars in cash, methamphetamine, firearms, vehicles with hidden compartments, pay/owe ledgers, and various other indicia of drug sales.  Gamboa's testimony provided a firsthand account of defendants' involvement in the DTO.

DEA agents testified they observed Jose getting the RV ready for travel and Gamboa testified that Jose purchased it for the purpose of smuggling drugs cross-country.  Furthermore, during final argument, Guillermo and Emanuel's counsel conceded their guilt as to the drug-trafficking and possession charges.  Emanuel's attorney told the jury: "He was criminally liable for his activities of the organization.  He knew that they were dealing in drugs, and he participated in that."  Guillermo's attorney acknowledged that "Guillermo and Emanuel share exactly the . . . same counts:  the conspiracy to traffic cocaine; . . . the possession of cocaine for sale; the possession of methamphetamine for sale. [¶] I told you during my opening argument I'm not contesting those facts.  The evidence is overwhelming.  I'm not going to . . . try to convince you that there's a defense for that.  I mean, at the point of the takedown, with that amount of cocaine and the wiretaps and everything else, the evidence is probably sufficient to find Guillermo guilty of those three charges."  Given the weight of the evidence, any error in admitting

46

the unplayed recordings and accompanying transcripts was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

*F. Instructional error regarding identification of defendants on wiretaps*

The defendants next argue that the trial court's instructions to the jury regarding coconspirators' statements and Dalida's identifications of defendants in the wiretap transcripts lowered the prosecution's burden of proof, violating their due process rights. We disagree.

*1. Relevant background*

During a break in Dalida's trial testimony, Jose's attorney again raised his objection to admission of the wiretap transcripts identifying the speakers on the calls. The prosecutor argued that "the proper foundation ha[d] been laid for [] Dalida to give her opinion about the participants" on the call based on "[her] testimony this morning at the [Evidence Code section] 402 hearing, her testimony on the stand, and then [] Gamboa's testimony at the 402 hearing on June 28th of 2017." Jose's attorney asked that the court instruct the jury during Dalida's testimony that it was their role to determine the identity of the participants and "there must be proof beyond a reasonable doubt as to the identity." The court replied that it would give a pinpoint instruction informing the jury that it was the prosecution's " 'burden, by a preponderance of the evidence, to [] prove who the voices are in the recording[, and] [i]f [the prosecutor] [has] not satisfied that burden,' " the jury " 'must disregard that evidence.' "

After Dalida returned to the witness stand, the trial court admitted the binder of transcripts into evidence and instructed the jury, without objection, as follows: "[T]here's labels associated with names of—as participants in the phone calls in these transcripts. That's just for labeling purposes and for following [along]. . . . But just because it's written down that way, doesn't mean it's true. It's up for [*sic*] you to determine. [¶] So, for example, the first one, it says 'Participants: Vargas-Alvarez, Jose, aka Pato, Lucas, Pariente.' That's in there, and that's going to help keep track of the

47

testimony. But just because it's written down doesn't mean it's true. That's one of the factual findings for you to determine, that it is—after listening to [] Dalida's testimony, [] Gamboa's testimony, all of the testimony, you will determine whether, in fact, that is—Jose [] is one of the participants in the phone call. [¶] If it is, you determine that by a preponderance of the evidence, then you consider the content of the phone call, along with all the other evidence. If you're not persuaded that it's [] Jose [] on that particular phone call, then you can't consider it against him. [¶] So, in other words, basically what I'm saying is just because it's labeled that way, doesn't mean it's true. It's for you to determine whether it's true or not."

Prior to deliberations, the court gave the following instruction (CALCRIM No. 418) on coconspirator statements: "In deciding whether the People have proved the defendants committed any of the crimes charged, you may not consider any statement made on the wiretap or statements made by [] Gamboa in furtherance of the alleged conspiracy unless the People have proved by a preponderance of the evidence that: [¶] 1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; [¶] 2. Jose, Guillermo, and Emanuel were members of and participating in the conspiracy when they made the statement; [¶] 3. Jose, Guillermo, and Emanuel made the statement in order to further the goal of the conspiracy; and [¶] 4. The statement was made before or during the time the defendants were participating in the conspiracy. [¶] . . . [¶] Proof by a preponderance of the evidence is a different standard of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true." There was no objection.

### 2. *Applicable legal principles*

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court

48

must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

Evidence Code section 1223 authorizes the admission of a coconspirator's hearsay statement if: "(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [and] [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy." Evidence Code section 1223 "is a statutory application of the standard of Evidence Code section 403 to the foundational requirement of a conspiracy for the purposes of admission of a coconspirator's statement." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61.) Where the "proffered evidence is of a statement . . . of a particular person and the preliminary fact is whether that person made the statement," the evidence is inadmissible unless the court first determines there is sufficient evidence to sustain a finding of that preliminary fact. (Evid. Code, § 403, subd. (a)(4).)

"If the court admits the proffered evidence under this section, the court: [¶] [] May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." (Evid. Code, § 403, subd. (c).) In applying Evidence Code section 403, "[t]he proper standard is that of preponderance of the evidence." (*People v. Marshall* (1996) 13 Cal.4th 799, 832.)

*3. Analysis*

In this case, the jury was instructed that it could not consider the wiretap calls as evidence against the defendants unless it found by a preponderance of the evidence that the recorded statements were actually made by the persons alleged to have made them. This instruction was correct.

Both the authenticity of an audio recording and the identity of a participant in a phone call are preliminary facts, which the proponent of that evidence has the burden to prove. (See, e.g., Evid. Code, § 403, subd. (a)(4) [where proffered evidence is of a statement and "the preliminary fact is whether that person made the statement"]; Evid. Code, § 403, subd. (a)(3) ["The preliminary fact is the authenticity of a writing"].) For party admissions under Evidence Code section 1220, the identity of the declarant is the only preliminary fact that must be proven. (Evid. Code, §§ 115, 403, subd. (a)(4).) Where the existence of a preliminary fact is at issue, the proponent must offer evidence sufficient for the trier of fact to determine that the preliminary fact is more likely than not to be true. (*People v. Herrera*, *supra*, 83 Cal.App.4th at p. 61.)

The trial court's instruction informed the jury that before it could consider an out-of-court statement made by one of the coconspirators it had to first find that the prosecution had proved by a preponderance of the evidence: (1) that some other evidence, beyond the statement itself, established that a conspiracy existed at the time the statement was made; (2) the defendants were members of and participating in the conspiracy at the time the statement was made; (3) the statement was made in order to further the conspiracy; and (4) the statement was made either before or during the time that the defendants were participating in the conspiracy. This instruction correctly described the standard of proof required to permit the jury to consider statements which otherwise would be inadmissible hearsay.

Defendants' argument would perhaps have merit if this were the only standard of proof instruction the jury received, but it was not. The trial court instructed the jury with

CALCRIM No. 220, informing it that the prosecution had to prove its case against the defendants "beyond a reasonable doubt," and that unless the evidence proved defendants "guilty beyond a reasonable doubt, they are entitled to an acquittal and [the jury] must find them not guilty." In addition, the instructions on each of the substantive offenses also advised the jury that the prosecution had to prove every element of those offenses beyond a reasonable doubt.

As to out-of-court statements specifically, the trial court instructed the jury that a "defendant may not be convicted of any crime based on his out-of-court statements alone," and that the jurors "may not convict a defendant unless the People have proved his guilt beyond a reasonable doubt." Based on this constellation of instructions, no reasonable jury would have concluded that the prosecution's burden of proof on the substantive offenses was only preponderance of the evidence.

We also look to the arguments of counsel in evaluating a claim that the jury misapprehended the instructions given. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) Jose's counsel argued that the jurors must be convinced of the voice identification on the audio "beyond a reasonable doubt" and encouraged the jurors to "draw your own conclusions about whether there is sufficient uniqueness to the voices so that you can conclude beyond a reasonable doubt that it's the voice of a particular person." The defense attorneys, as well as the prosecutor, expressly reminded the jury that it was the prosecution's burden to prove defendants' guilt beyond a reasonable doubt.

*G. Instructional error regarding aider and abettor liability*

Defendants claim that the trial court violated their right to due process, a fair trial, and the right to a jury determination beyond a reasonable doubt when it failed to instruct the jury that liability for a coconspirator's acts must be limited to acts "in furtherance of" the conspiracy. We disagree.

51

*1. Relevant background*

The trial court instructed the jury regarding the possession offenses (counts 10, 11, 12, 14, 15, 16, 17 & 28) in relevant part, as follows: "You must first decide whether the defendant is guilty of conspiracy to traffic cocaine. If you find the defendant is guilty of this crime, you must then decide whether he is guilty of the possession offenses. [¶] Under certain circumstances, a person who's guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove the defendant is guilty of the possession offenses, the People must prove that: [¶] 1. The defendant is guilty of conspiracy to traffic cocaine; [¶] 2. During the commission of that conspiracy, a coparticipant in that conspiracy committed the possession offenses; and [¶] 3. Under all of the circumstances, a reasonable person in defendant's position would have known that the commission of the possession offenses was a natural and probable consequence of the commission of conspiracy to traffic cocaine. [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. . . . [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] To decide whether the possession offenses were committed, please refer to the separate instructions I will give you on that crime."

In addition, the court instructed the jury on both general principles of aiding and abetting (CALCRIM No. 400) and aiding and abetting intended crimes (CALCRIM No. 401).

*2. Applicable legal principles*

"A conspirator is vicariously liable for the unintended acts by coconspirators if such acts are in furtherance of the object of the conspiracy, or are the reasonable and natural consequence of the object of the conspiracy." (*People v. Hardy* (1992) 2 Cal.4th 86, 188.) Like a conspirator, "an aider and abettor . . . is liable for unintended crimes."

(*People v. Smith* (2014) 60 Cal.4th 603, 615 (*Smith*).)  "An aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime."  (*Id*. at p. 611.)

### 3. *Analysis*

As the California Supreme Court explained in *Smith*, the difference between aider and abettor liability and coconspirator liability justifies the omission of an "in furtherance of" limitation from the former:  "An aider and abettor is someone who, with the necessary mental state, 'by act or advice aids, promotes, encourages or instigates, the commission of the crime.'  [Citation.]  Because the aider and abettor is furthering the commission, or at least attempted commission, of an actual crime, it is not necessary to add a limitation on the aider and abettor's liability for crimes other principals commit beyond the requirement that they be a natural and probable, i.e., reasonably foreseeable, consequence of the crime aided and abetted."  (*Smith*, *supra*, 60 Cal.4th at pp. 616-617.)  However, a coconspirator "can be liable for a crime committed by any other conspirator, and the defendant need not *do* (or even encourage) anything criminal except agree to commit a crime."  (*Id*. at p. 616.)  Accordingly, a conspirator is not liable for a coconspirator's crime if it is " ' "a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design." ' "  (*Ibid*.)

"[A] natural and probable consequence of a conspiracy need not be an act in furtherance of the conspiracy; it simply must be a ' "reasonably foreseeable consequence of the [target crime] aided and abetted." ' "  (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 741.)  In this case, the "target crime" was conspiracy to traffic cocaine and the trial court properly instructed the jury that, if it found defendants guilty of the target crime, it could also find them guilty of the possession offenses so long as it determined that the possession offenses were a natural and probable consequence of aiding and abetting the drug-trafficking conspiracy.

In any event, even if the trial court's instruction was erroneous, we find that defendants cannot show prejudice.

We review claims of inadequate instruction under the *Chapman* harmless error standard and must reverse the conviction unless we "determine[] the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.) Under *Chapman*, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, at p. 13.)

Here, the record demonstrates that any instructional error was harmless beyond a reasonable doubt. All three defendants were present at the stash house during the takedown and thus were in constructive possession of the drugs, cash, vehicles with hidden compartments, and other indicia of sales found during the search. According to Gamboa, Emanuel and Jose had keys to the locked bedroom where much of the contraband was found, and Guillermo had recently driven a load of drugs to the house from Los Angeles. During final argument, Emanuel and Guillermo's counsel essentially conceded their guilt on the possession offenses.

Furthermore, as a threshold matter, the jury had to conclude that defendants were involved in the DTO in order to find them guilty of conspiracy to traffic cocaine (count 1). Gamboa testified that Jose was in charge of the entire operation, Emanuel ran the stash house, and Guillermo transported large quantities of drugs and the cash to buy those drugs in vehicles equipped with hidden compartments. "No reasonable jury that made all of those findings could have failed to find" that defendants also possessed the cocaine, methamphetamine, and hidden vehicle compartments discovered at the stash house. (*People v. Merritt* (2017) 2 Cal.5th 819, 832.)

54

*H. Instructional error regarding weight enhancement*

Guillermo, joined by Emanuel, argues the weight enhancement attached to their conviction for possessing cocaine for sale (count 10) must be reversed because the trial court failed to instruct the jury that it was required to find each of them was "substantially involved" in the offense. Their claim fails.

*1. Relevant background*

Pursuant to CALCRIM No. 3200, the trial court instructed the jury that to convict defendants of the conspiracy to traffic cocaine charged in count 1, it must find that defendants "possessed more than 80 kilograms of cocaine by weight" and were "substantially involved in the planning, direction, execution, or financing of the conspiracy to traffic the cocaine." With respect to the cocaine possession charge (count 10), however, the court gave the following challenged instruction: "If you find the defendant guilty of the crime charged in Count 10, possession of cocaine for sale, you must then decide whether, for each crime, the People have proved the additional allegation that the crime involved more than a specified amount or more [*sic*] of a controlled substance. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation, the People must prove that: [¶] 1. The defendant possessed more than 80 kilograms of cocaine by weight."

The jury convicted Guillermo and Emanuel of the conspiracy charged in count 1, but expressly found that neither was "substantially involved" in the conspiracy. The jury also convicted them of possessing cocaine for sale and found true the attached weight enhancement, but the jury was not instructed to also find that the defendants were substantially involved.

*2. Applicable legal principles*

At the time of the charged offenses, Health and Safety Code section 11370.4 provided: "(a) Any person convicted of a violation of, or of a conspiracy to violate,

Section 11351, 11351.5, or 11352 . . . shall receive an additional term as follows: [¶] . . . [¶] (6) Where the substance exceeds 80 kilograms by weight, the person shall receive an additional term of 25 years. [¶] The conspiracy enhancements provided for in this subdivision shall not be imposed unless the trier of fact finds that the defendant conspirator was substantially involved in the planning, direction, execution, or financing of the underlying offense."

Health and Safety Code section 11370.4 does not require substantial involvement where a defendant is convicted not of a conspiracy, but of another substantive offense based on a theory of conspiracy liability.  The only reference to any "conspiracy enhancement" in subdivision (a) of that statute is the reference to "[a]ny person convicted of . . . a conspiracy to violate" one of the enumerated sections.  (Health & Saf. Code, § 11370.4, subd. (a).)  "The doctrine of conspiracy plays a dual role in our criminal law.  First, conspiracy is a substantive offense in itself. . . .  Second, proof of a conspiracy serves to impose criminal liability on all conspirators for crimes committed in furtherance of the conspiracy." (*People v*. *Salcedo* (1994) 30 Cal.App.4th 209, 215 (*Salcedo*).)  "[T]he only conspiracy enhancement identified in [Health and Safety Code section 11370.4] is one that applies to the substantive offense of conspiracy." (*Id*. at p. 216.)

"It is apparent [Health and Safety Code] section 11370.4 does not require substantial involvement where a defendant is convicted of a substantive offense upon a theory of joint conspirator liability." (*Salcedo*, *supra*, 30 Cal.App.4th at p. 216.)  "[B]efore 1989, the weight enhancements provided for in [Health and Safety Code section] 11370.4 did not apply to a defendant convicted of conspiracy to commit a drug offense.  [Citation.]  This oversight was remedied by enactment of Assembly Bill No. 2448 in 1989 which added 'Any person convicted of . . . *a conspiracy to violate* . . .' in subdivision (b) of the statute.  [Citations.]  The amendment also added the 'substantial involvement' language discussed above." (*Ibid*.)  The Senate Judiciary report on Assembly Bill No. 2448 described the purpose of the bill as follows:  " 'This bill would

56

apply the above [weight] enhancements *where a defendant is convicted of conspiracy to commit the above offenses*.  However, the conspiracy enhancements apply only where the defendant was substantially involved in the planning, direction, execution, or financing of the underlying offense. [¶] The purpose of this bill is to extend sentence enhancements to large narcotic traffickers who do not personally handle the narcotics but who are often prosecuted for conspiracy.' " (*Salcedo*, at p. 217.)  Thus, as *Salcedo* concluded, the legislative history of the statute supports the conclusion that substantial involvement is required only where the weight enhancement is attached to a conspiracy conviction.

### *3. Analysis*

The trial court instructed on several theories of liability with respect to count 10, including aiding and abetting, the natural and probable consequences doctrine, and joint and constructive possession.  Defendants argue that, because they could have been convicted of those crimes on a theory of vicarious liability as coconspirators, the jury was required to expressly find that they were substantially involved in the conspiracy.  However, as explained in *Salcedo*, the weight-enhancement statute, Health and Safety Code section 11370.4, does not require substantial involvement where a defendant is convicted not of a conspiracy, but of another substantive offense based on a theory of conspiracy liability.  Accordingly, the trial court properly instructed the jury regarding the weight enhancement attached to count 10.

### *I. Trial court responses to jury questions regarding possession*

Defendants' final substantive argument is that the trial court erroneously removed a factual issue from the jury's consideration by its answers to two jury questions posed during deliberations regarding the meaning of the term possession.  Again, we disagree.

### *1. Relevant background*

On August 14, 2017, the jury sent a note to the trial court asking, "In order to possess something, do you have to know its exact location?"  Without objection, the court responded as follows:  "A: No, a person does not have to know the exact location of

57

something to possess it. [¶] Actual or constructive possession is the right to exercise dominion and control over the contraband or the right to exercise dominion and control over the place where it is found. [¶] Actual possession means the object is knowingly in the defendant's immediate possession or control. A defendant has actual possession when he himself has the object. [¶] Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object. A person has constructive possession when the contraband, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others. [¶] Exclusive possession is not necessary. A person has constructive possession if his knowing exercise of dominion and control over the place where the contraband is located is shared with others."

Two days later, on August 16, 2017, the jury submitted another question about possession: "This is a question w.r.t.[16] possession. If a person has a control [*sic*] over a place and a prohibited item is found in this place, can this person be held liable for possession of this item even if this person does not know that this item existed? In other words, can this person possess something without knowing that it exists (knowing that he has it) as long as it is found in the area he controls[?]" With the parties' concurrence, the court responded: "No, a person cannot be found guilty of possession if that person does not know the item exists. Knowledge of the presence of the item is a required element (See Element #2 in instruction 2302), although, as explained in Answer to Jury Question #2, knowledge of the exact location is not required."

### 2. *Applicable legal principles*

On appeal, the court "review[s] de novo the legal accuracy of any supplemental instructions provided" by the trial court. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887.) "When an appellate court addresses a claim of jury misinstruction, it must assess

---

[16] We presume "w.r.t." is an abbreviation for "with regard to."

the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803 (*Wilson*).) "We of course presume 'that jurors understand and follow the court's instructions.' " (*Ibid.*)

### 3. Analysis

Constructive possession "is established by showing that defendant maintained some control or right to control over contraband in the physical possession of another." (*People v. Rogers* (1971) 5 Cal.3d 129, 134.)

Defendants contend that the trial court's responses to the jury's questions, particularly the response to Jury Question #2 about "possession," "included an overbroad definition" of the concept of constructive possession. As the Attorney General points out, the court's answer to that question is almost identical to the Court of Appeal's description of possession set forth in *People v. Rushing* (1989) 209 Cal.App.3d 618: "Actual or constructive possession is the right to exercise dominion and control over the contraband or the right to exercise dominion and control over the place where it is found. [Citation.] Exclusive possession is not necessary. A defendant does not avoid conviction if his right to exercise dominion and control over the place where the contraband was located is shared with others." (*Id.* at p. 622.) "Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another." (*People v. Williams* (1971) 5 Cal.3d 211, 215.)

The court's responses to the questions about possession properly instructed the jury that defendants had to: (1) know the contraband existed; and (2) either maintain control or a right to control the contraband, or have dominion or control (sole or joint)

over the place where the contraband is found.  We are not persuaded by defendants' argument that the court's definition would result in convictions of persons who knew of contraband and had control over the place it was located, but had no control over the contraband itself.  The trial court here expressly informed the jury that the defendant must have "dominion and control" over the contraband.

Viewing the instructions as a whole, the trial court's responses to the jury's questions did not lessen the prosecution's burden of proof.  (*Wilson*, *supra*, 44 Cal.4th at p. 803.)  The trial court correctly instructed the jury that a person possesses something "if the person has control over it or the right to control it, either personally or through another person."  It also instructed the jury on the knowledge element of the possession offenses.  It is not reasonable to presume that the jury misunderstood these instructions and applied them improperly.

Finally, there was overwhelming evidence supporting the possession convictions. Jose and Emanuel were living at the stash house when the takedown occurred.  The defendants were taken into custody at the residence and, according to Gamboa, Emanuel managed the stash house for the DTO while Jose was in charge of the entire operation.  It was therefore reasonable for the jury to infer that Jose had control over all the DTO's contraband and that Emanuel had at least constructive control over it due to his job as house manager.  Guillermo was directly involved in driving vehicles filled with drugs and cash to and from the stash house, and thus also was reasonably found to be in constructive possession of the contraband.

*J. Cumulative error*

Defendants argue that their convictions must be reversed due to cumulative prejudice, but there are no errors to cumulate.  Since we have not found error, defendants' cumulative error argument fails.  (*In re Reno* (2012) 55 Cal.4th 428, 483; *Sedillo*, *supra*, 235 Cal.App.4th at p. 1068.)  To the extent we have assumed error for purposes of analysis, none of these errors increases the impact of any other and their cumulative

impact did not deprive defendants of a fair trial or the right to due process. (See *People v. Thomas* (2011) 51 Cal.4th 449, 508.)

### K. Senate Bill No. 567

#### 1. Relevant background

In this case, the trial court sentenced Emanuel and Guillermo to the upper term of four years for possession of cocaine plus a 25-year weight enhancement (Health & Saf. Code, §§ 11351, 11370.4, subd. (a); count 10), and imposed and stayed a middle term sentence of four years for conspiracy to transport cocaine conviction. (§ 182, subd. (a)(1); Health & Saf. Code, § 11352; count 1.) Emanuel was also sentenced to concurrent two-year middle term sentences for possession of methamphetamine (Health & Saf. Code, § 11378; count 11), and possession of false compartments (Health & Saf. Code, § 11366.8, subd. (a); counts 16 & 17).

At sentencing, the trial court explained its rationale as follows: "I am going to impose the sentences recommended by Probation based on the fact that this is a multimillion dollar, hundreds of pounds of cocaine, drug trafficking organization. And as the district attorney pointed out in his moving papers, the average dose of cocaine for use is 1/10 of a gram, and what was recovered here, 85 kilograms, makes 850,000 doses of cocaine into our community. And that is why I'm sentencing them. [¶] It is [section] 1170(h) and . . . the change in the law that seems to be growing more lenient on drug users has no role for major, major drug dealers, which is what we have here."

#### 2. Amendments to section 1170

At the time Emanuel and Guillermo were sentenced, former section 1170 provided that when a judgment of imprisonment is to be imposed and a statute specifies three possible terms, "the choice of the appropriate term shall rest within the sound discretion of the court." (Former § 1170, subd. (b).) Senate Bill No. 567 amended section 1170, effective January 1, 2022. (Stats. 2021, ch. 731, § 1.3.) Under the newly-amended version of section 1170, when a judgment of imprisonment is to be imposed and a statute

61

specifies three possible terms, "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in [section 1170, subdivision (b)(2)]." (§ 1170, subd. (b)(1).) Section 1170, subdivision (b)(2) provides that the trial court may impose a sentence exceeding the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

Senate Bill No. 567 also added subdivision (b)(6) to section 1170, which now provides the following: "Notwithstanding [section 1170, subdivision (b)(1)], and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (Stats. 2021, ch. 731, § 1.3.) Section 1016.7, subdivision (b) defines a "youth" as "any person under 26 years of age on the date the offense was committed."[17]

---

[17] The indictment in this case alleged that the crimes committed by Emanuel and Guillermo occurred between August 2008 and mid-March 2009. Emanuel was born on September 1, 1989, and was 18 or 19 years old on the dates of the offenses. Guillermo was born on December 2, 1982, and was thus "under 26 years of age" (§ 1016.7, subd. (b)) during the first few months of the conspiracy, i.e., from August 1, 2008, to December 2, 2008.

In *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the California Supreme Court held that, where an "amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final," and there is no clear expression of legislative intent to the contrary, the amended statute will apply. (*Id*. at p. 744.)

As this case is not yet final, Emanuel and Guillermo are entitled to the retroactive application of section 1170, subdivision (b) as amended by Senate Bill No. 567 because the amendments are ameliorative and nothing in Senate Bill No. 567 indicates that the Legislature intended those amendments to apply solely prospectively. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; see also *People v. Frahs* (2020) 9 Cal.5th 618, 627-630.) Accordingly, we will reverse the judgments against Emanuel and Guillermo and remand the matter for resentencing under section 1170, as amended by Senate Bill No. 567.

The Attorney General argues that, on remand, the district attorney should be given the opportunity to either prove the existence of aggravating circumstances before a jury in compliance with section 1170, subdivision (b)(2) or submit to resentencing based on the state of the current record. The Attorney General claims that such an election is proper because the district attorney was not obligated to comply with the amended version of section 1170, subdivision (b)(2) at the time of defendants' trial or at sentencing, and such an election would not violate either the double jeopardy clause or constitute an ex post facto violation.

We agree with the Attorney General. Even if we assume that the double jeopardy clause applies to sentencing factors, Emanuel and Guillermo have never been tried on any of the aggravating circumstances, rendering this constitutional provision inapplicable. (See *People v. Monge* (1997) 16 Cal.4th 826, 832 [double jeopardy clause " 'protects against a second prosecution for the same offense after acquittal' "].) Moreover, section 1170, subdivision (b)(2) does not increase the punishment for an offense because the same statutorily-prescribed sentencing range remains intact. (See *Collins v.*

*Youngblood* (1990) 497 U.S. 37, 46 [ex post facto law is one that imposes an additional punishment to what was originally prescribed].)  Thus, on remand, the district attorney should be given the opportunity to prove the existence of aggravating circumstances in compliance with the amended statute.

### L. Criminal laboratory analysis and drug program fees

Defendants[18] claim the trial court miscalculated the criminal laboratory analysis fee (Health & Saf. Code, § 11372.5) and the drug program fee (*id*., § 11372.7) as well as the corresponding penalty assessments.  The Attorney General concedes the argument, and further points out that the trial court erred by failing to stay certain fees pursuant to section 654.  We agree the concession is well taken.

#### 1. Relevant background

At sentencing, the trial court imposed on Jose:  (1) a $200 criminal laboratory analysis fee, with $560 in penalty assessments; and (2) a $600 drug program fee, with $1,680 in penalty assessments.  Emanuel and Guillermo were each ordered to pay: (1) $350 criminal laboratory fees, plus $980 in penalty assessments; and (2) $1,050 drug program fees, plus $2,940 in penalty assessments.

#### 2. Laboratory analysis fee

Pursuant to Health and Safety Code section 11372.5, subdivision (a), "[e]very person who is convicted of a [qualifying section of the Health and Safety Code] . . . shall pay a criminal laboratory analysis fee in the amount of fifty dollars ($50) for each separate offense."  The fee must also be imposed on convictions for conspiracy to commit one of the specified offenses.  (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1119.)

---

[18] Although we are reversing the judgments against Emanuel and Guillermo, we include our analysis of the fines and fees imposed on them for the trial court's guidance at their resentencing hearings.

Since this fee constitutes punishment, it "must be stayed under section 654" where appropriate. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 869 (*Sharret*).)

The crime lab fee is subject to seven mandatory penalty assessments. (*Sharret*, *supra*, 191 Cal.App.4th at pp. 862-864.) At the time of defendants' offenses in 2008 and 2009, those assessments were (1) a 100 percent state penalty assessment (§ 1464, subd. (a)); (2) a 20 percent state surcharge (§ 1465.7); (3) a 35 percent state court construction penalty (Gov. Code, §§ 70372, subd. (a), 70375, subd. (b)); (4) a 55 percent additional penalty (Gov. Code, § 76000, subds. (a), (e)); (5) a 20 percent emergency medical services penalty (Gov. Code, § 76000.5); (6) a 10 percent penalty for implementation of the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (Gov. Code, § 76104.6, subd. (a)(1)); and (7) a 40 percent state-only DNA penalty (Gov. Code, § 76104.7). (See *People v. Hamed* (2013) 221 Cal.App.4th 928, 940-941.)

In this case, Jose was convicted of four qualifying offenses: (1) two counts of conspiracy to traffic cocaine (§ 182, Health & Saf. Code, § 11352; counts 1, 8); (2) possession of cocaine for sale (Health & Saf. Code, § 11351; count 10); and (3) possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 11). The trial court correctly calculated Jose's criminal laboratory analysis fee at $200 ($50 multiplied by four counts) with $560 in penalty assessments.[19] However, because the court stayed punishment for Jose's conviction on count 1 under section 654, it should

---

[19] At the time the offenses were committed in 2008 and 2009, the appropriate multiplier for penalty assessments on crime lab fees was 280 percent, consisting of: (1) a 100 percent state penalty assessment (§ 1464, subd. (a)); (2) a 20 percent state surcharge (§ 1465.7); (3) a 35 percent state court construction penalty (former Gov. Code, §§ 70372, subd. (a), 70375, subd. (b)); (4) a 55 percent additional penalty (Gov. Code, § 76000, subds. (a), (e)); (5) a 20 percent emergency medical services penalty (Gov. Code, § 76000.5); (6) a 10 percent penalty for implementation of the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (Gov. Code, § 76104.6, subd. (a)(1)); and (7) a 40 percent state-only DNA penalty (Gov. Code, § 76104.7).

have also stayed the $50 crime lab fee and $140 of the penalty assessment associated with that count.  (*Sharret*, *supra*, 191 Cal.App.4th at pp. 869-870.)

Emanuel and Guillermo were convicted of three qualifying offenses: (1) conspiracy to traffic cocaine (§ 182, Health & Saf. Code, § 11352; count 1); (2) possession of cocaine for sale (Health & Saf. Code, § 11351; count 10); and (3) possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 11). The trial court imposed $350 criminal laboratory analysis fees on Emanuel and Guillermo, rather than $150 ($50 per each of three counts) as it should have.[20]  The associated total penalty assessments must also be reduced to $420 (280 percent of $150).

As with Jose, the trial court stayed punishment on count 1 for both Emanuel and Guillermo pursuant to section 654.  As a result, it should have also stayed $50 in criminal laboratory analysis fees and $140 in penalty assessments imposed in connection with that count.

### 3. Drug program fee

Health and Safety Code section 11372.7, subdivision (a), states:  "Except as otherwise provided . . . each person who is convicted of a violation of this chapter shall pay a drug program fee in an amount not to exceed one hundred fifty dollars ($150) for each separate offense."  Like the crime lab fee, the drug program fee is punitive and is therefore subject to both section 654 and the same penalty assessments.  (*Sharret*, *supra*, 191 Cal.App.4th at pp. 869-870; *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1695-1696.)

---

[20] It appears the trial court relied on the figures set forth in the probation reports. Because Emanuel and Guillermo were each found guilty of seven separate violations of the Health and Safety Code, we surmise that the probation department believed that each of those seven violations was a qualifying conviction under Health and Safety Code section 11372.5 and multiplied $50 by seven, rather than three.

Jose was convicted of eight qualifying offenses:  conspiracy to traffic cocaine (§ 182, subd. (a)(1), Health & Saf. Code, § 11352; counts 1, 8); possession of cocaine for sale (Health & Saf. Code, § 11351; count 10); possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 11); possessing more than $100,000 for the purchase of drugs (Health & Saf. Code, § 11370.6; count 14); and possession of a false compartment (Health & Saf. Code, § 11366.8, subd. (a); counts 15, 16, 17).

At sentencing, the trial court imposed a total drug program fee of $600, or $75 per qualifying conviction.  The court did not explain why it decided to impose a fee less than the statutory maximum of $150 per conviction but the Attorney General rightly notes that the trial court acted within its discretion in doing so.  (See Health & Saf. Code, § 11372.7, subd. (a) [drug lab fee "not to exceed" maximum of $150].)  Having stayed punishment on count 1 under section 654, the court should also have stayed the $75 drug program fee imposed on that count as well as the corresponding $210 in penalty assessments.

Guillermo and Emanuel were each convicted of seven offenses subject to the drug program fee:  conspiracy to traffic cocaine (§ 182, subd. (a)(1), Health & Saf. Code, § 11352; count 1); possession of cocaine for sale (Health & Saf. Code, § 11351; count 10); possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 11); possessing more than $100,000 for the purchase of drugs (Health & Saf. Code, § 11370.6; count 14); and possession of a false compartment (Health & Saf. Code, § 11366.8, subd. (a); counts 15, 16, 17).  While the trial court imposed the maximum drug program fee of $150 per conviction ($1,050 in total), it should have stayed the $150 fee and $420 in penalty assessments imposed on count 1.

*M. Impact of Government Code section 6111*

As of July 1, 2021, the statutory provisions pursuant to which the court ordered defendants to pay a $259.50 criminal justice administration fee were repealed, and newly-enacted Government Code section 6111 became effective.  Government Code

67

section 6111 provides: "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated. [¶] (b) This section shall become operative on July 1, 2021."

Because this change in the law became effective after the parties had submitted their briefs in this matter, we requested that the parties provide supplemental briefing on the question of the effect of the repeal of former Government Code section 29550 et seq. and the enactment of Government Code section 6111 on this pending appeal.

In response to our request for supplemental briefing, defendants argue that they are entitled to having that portion of the judgment imposing the criminal justice administration fees vacated pursuant to *Estrada*, *supra*, 63 Cal.2d 740. The Attorney General agrees that the any unpaid portion of the criminal justice administration fees is uncollectible and must be vacated.

Pursuant to the plain language of Government Code section 6111, the unpaid balance of the criminal justice administration fees is unenforceable and uncollectible, and the portion of the judgments imposing such costs must be vacated. Accordingly, we will exercise our authority to modify Jose's judgment[21] as mandated by the new law.

*N. Impact of section 1465.9*

Emanuel's supplemental brief also notes that section 1203.1b, which authorized the imposition of a presentencing report fee and a monthly probation supervision fee, has also been repealed effective July 1, 2021. Section 1465.9, which became operative on July 1, 2021, provides in pertinent part, as follows: "(a) The balance of any court-imposed costs pursuant to Section 987.4, subdivision (a) of Section 987.5,

___

[21] As we are reversing the judgments against Emanuel and Guillermo for resentencing, modifying those judgments would be an idle act.

68

Section[] . . . 1203.1b, . . . as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated. [¶] (b) On and after January 1, 2022 the balance of any court-imposed costs pursuant to Section 1001.15, 1001.16, 1001.90, 1202.4, 1203.1, 1203.1ab, 1203.1c, 1203.1m, 1203.4a, 1203.9, 1205, 1214.5, 2085.5, 2085.6, or 2085.7, as those sections read on December 31, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."  (§ 1465.9; Assem. Bill No. 1869 (2019-2020 Reg. Sess.) § 62, amended Stats. 2021, ch. 257 § 35 (AB 177), effective Sep. 23, 2021.)

At Emanuel and Guillermo's sentencing hearing, the trial court imposed a $450 presentencing report fee (§ 1203.1b, subd. (a)) and a $110 per month probation supervision fee (§ 1203.1b, subd. (a)).  Section 1465.9 provides that the unpaid balance of those fee orders is "unenforceable and uncollectible" and the portion of the judgment imposing those fees must be vacated.  Since we are reversing the judgments against Emanuel and Guillermo and remanding for resentencing, this issue is now moot.

### III.   DISPOSITION

Defendant Jose Vargas-Alvarez's judgment is modified as follows:  (1) $50 of the $200 criminal laboratory analysis fee, along with $140 of the $560 in associated penalty assessments, are stayed pursuant to Penal Code section 654; (2) $75 of the $600 drug program fee, along with $210 of the $1,680 in associated penalty assessments, are stayed pursuant to Penal Code section 654; and (3) any portion of the $259.50 criminal justice administration fee imposed by the court pursuant to Government Code section 29550.1 that remains unpaid as of July 1, 2021, is vacated.  As modified, defendant Jose Vargas-Alvarez's judgment of conviction is affirmed.  The trial court is directed to correct the minute orders and abstract of judgment to reflect the modifications set forth above and forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

The judgments as to defendants Emanuel Vargas-Alvarez and Guillermo Velasquez are reversed and the matters are remanded for resentencing under Penal Code section 1170 as amended by Senate Bill No. 567. On remand, the trial court may reconsider all of its sentencing decisions, and the district attorney may elect to prove circumstances in aggravation permitting the imposition of upper terms as required under Penal Code section 1170, subdivision (b)(2) or to submit to resentencing on the current record.

_____
Greenwood, P. J.


I CONCUR:




_____
Elia, J.




People v. Vargas-Alvarez
H045450

Grover, J., Concurring and Dissenting

I agree with the majority opinion in all respects except for its analysis (in section II.B.3.) of the motion to suppress evidence obtained through a GPS tracking device installed by DEA agents on an RV parked in the driveway of a home in Gilroy. As I will explain, I believe the warrantless placement of tracking devices on the RV violated the Fourth Amendment and necessitates reversal of the conviction in count 8 for conspiracy to traffic cocaine. I respectfully dissent as to that issue.

Placing a GPS transmitter on a vehicle and using it to monitor the vehicle's movements is a search for Fourth Amendment purposes. (*United States v. Jones* (2012) 565 U.S. 400, 404.) Here the agents did not obtain a warrant to place a GPS device on the RV. Because the Fourth Amendment prohibits warrantless searches of places where someone has a reasonable expectation of privacy (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 454), the controlling question is whether the RV was in such a place. In my view, the prosecution did not meet its burden to prove there was no reasonable expectation of privacy in the home driveway where the RV was parked and the GPS devices affixed on successive nights. (*People v. Williams* (1999) 20 Cal.4th 119, 127 [prosecution has the burden of proving a warrantless search was constitutionally reasonable].)

It is well settled there is a reasonable expectation of privacy in the area "immediately surrounding a dwelling house," often referred to as the curtilage. (*United States v. Dunn* (1987) 480 U.S. 294, 300 (*Dunn*).) As the majority notes, to determine whether a location falls within the curtilage, a court may consider several factors, including "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (*Id.* at p. 301.) The inquiry is ultimately whether "the area in

question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  (*Ibid*.)

Applying the *Dunn* factors, I conclude the RV was within the curtilage of the Gilroy residence.  Regarding the first (and arguably most important) factor—proximity— the RV was on the driveway with its front approximately seven feet from the residence and its rear approximately 30 feet from the garage.  Depending on whether the tracking devices were placed closer to the rear or the front of the 39-foot long vehicle (something not precisely disclosed in the record) the agents were anywhere between 46 and seven feet from the residence when they crawled underneath the RV.  Located at the end of a long driveway extending 136 feet from the public roadway, the area is closer to the home than to any publicly accessible place. Applying *Dunn* to these facts, I consider the location where the agents placed the GPS devices to be close to the residence.

I acknowledge that the second factor—whether the area is within an enclosure surrounding the home—weighs in favor of legality, but only slightly.  There was a fence along the front of the property, but it did not extend around the entire parcel. Nonetheless, the presence of some fencing increases the expectation of privacy by conveying a private boundary, although not to the same degree as completely enclosing the area.

The third consideration is the nature of the area's use, and whether it has been incorporated closely into the " ' "activity of home life." ' "  (*Collins v. Virginia* (2018) 138 S.Ct. 1663, 1671.)  The record contains little information on this point, but what is there indicates the area was associated with home life activity.  Parking a vehicle on a driveway leading to an associated garage is consistent with typical home use.

The final consideration is whether any steps were taken to protect the area from outside observation.  An approximately five-foot tall wrought iron fence runs for 223 feet across the front of the residence.  Although a wrought iron fence would not block view of the driveway from the outside, it signals to the public that the area is not accessible.

More significant is that the area in question is remote enough (at the end of a 136-foot driveway) to prevent it from being closely observed by passersby. The area at the end of a long driveway on this relatively rural property is fundamentally different from the driveway of a residence in a more urban setting abutting a public sidewalk. (Compare *People v. Zichwic* (2001) 94 Cal.App.4th 944, 953 [driveway of apartment building not within curtilage because it was next to the sidewalk; its accessibility and visibility ruled out any reasonable expectation of privacy].) The driveway of the detached residence here was sufficiently inaccessible to create an expectation of privacy.

On balance, I believe the *Dunn* factors weigh in favor of finding that the RV was parked within the curtilage and therefore entitled to the umbrella of privacy protection afforded to the home. The prosecution did not negate a reasonable expectation of privacy in the area, as would be required to justify this warrantless search. Placing the GPS devices on the RV without a warrant therefore violated the Fourth Amendment, and the trial court should have granted the motion to suppress evidence obtained through them.

An error in denying a motion to suppress will not result in reversal when it is beyond reasonable doubt the appellant would not have seen a more favorable outcome had the evidence been suppressed. (*People v. Camel* (2017) 8 Cal.App.5th 989, 998.) The effect of the error turns on the evidence obtained and whether it would have been discovered by other means. The tracking device on the RV driven by Jose Melendez-Ramirez directly affects the conviction in count 8 because it appears the contraband would not have been discovered were it not for DEA agents' use of the device.

According to the testimony of DEA agents at the suppression hearing, a few days after it was installed, the GPS device signaled that the RV was in motion, and agents used the GPS signal to track the RV to a gas station where they observed the activities of Jose Vargas-Alvarez and Jose Melendez-Ramirez. At that time they added a profile for Melendez-Ramirez to the DEA's El Paso Information Center (EPIC) database, noting "Jose Melendez-Ramirez is suspected to be interstate driver for Jose Vargas-Alvarez."

According to the testimony of Nebraska sheriff's deputies at the hearing, it was the EPIC database entry that led them to detain Melendez-Ramirez after a traffic stop and ultimately discover 100 kilograms of cocaine hidden in the RV he was driving.

Although other surveillance of Jose Vargas-Alvarez and Jose Melendez-Ramirez was occurring at the time the GPS devices were installed, it is not clear from the record that a database profile would have been created for Melendez-Ramirez had agents not observed his conduct at the gas station. And but for the GPS alert and tracking, that observation would not have occurred. It would be speculative to conclude that an EPIC profile would have been created for Melendez-Ramirez independent of the gas station observation and before the Nebraska traffic stop one month later.

On this record, I believe the DEA should have obtained a warrant allowing GPS devices to be placed on the RV, and I see no rationale for not doing so. I would therefore reverse Jose Vargas-Alvarez's conviction on count 8 and allow the prosecution to either retry or dismiss that count.

_____
Grover, J.

H045450 -*People v. Vargas-Alvarez et al.*